Brenna Bell (OSB # 01519)
Bark
P.O. Box 12065
Portland, OR 97212
Tel: 503-331-0374
brenna@bark-out.org

Jennifer R. Schwartz, (OSB #072978)
Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, Oregon 97239
Tel: 503-780-8281
Email: jenniferroseschwartz@gmail.com

Nicholas S. Cady (OSB # 113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel:  541-434-1463
Email: nick@cascwild.org

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| **BARK, CASCADIA WILDLANDS, OREGON WILD, AND WILDEARTH GUARDIANS,** | Case No.: |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **U.S. FOREST SERVICE**, a federal agency, | (Violations of National Forest Management Act; National Environmental Policy Act; Administrative Procedure Act) |
| Defendant. | |

1 - COMPLAINT

## INTRODUCTION

1.      Along the eastern shoulder of Mt. Hood National Forest (MHNF) lies a complex forest: diverse in species composition, elevation, forest type, past management, and fire history. Overlaying this diverse forest is a mantle of protection − designated critical habitat for the iconic northern spotted owl, a federally threatened species.

2.      This forest diversity expresses itself in many ways.  In the higher elevation, moist mixed conifer forests where fire is an infrequent visitor and commercial logging has not altered the landscape, multiple tree species grow together providing high-functioning habitat for northern spotted owl and other threatened and sensitive animals and plants.  Interspersed in these older forests are areas logged decades ago, where a sparse overstory of elder trees shelters a new understory of young conifers.  Head east, down the mountain, and the forest changes.  Here, fire was a more common visitor, regularly clearing the forest underbrush to nourish pines and other fire-adapted conifers.

3.      Across this ecologically important and diverse forest, MHNF planned its largest timber sale in over a decade.  Under direction from the Forest Service Regional Office, MHNF used Timber Sale Pipeline Restoration Funds to plan a sale the Regional Office expected to produce 100,000 CCF[1] of timber (approximately double the timber volume produced annually on the entire Forest).  Encompassing 11,742 acres, the "Crystal Clear Restoration Project" is the result (hereafter "CCR Project").

4.      Plaintiffs support the aspects of the CCR Project that are designed to restore natural ecosystem processes to forests that have departed from historical conditions (conditions present before Euro-American settlers began altering the landscape with intensive logging and fire

---

[1] Used to measure timber volume, a CCF (also called a cunit) is a unit of 100 ft³.

suppression in the early 20th century) and/or where a forested area has significantly departed from its natural fire regime. This includes thinning saplings across the entire project area and thinning plantations (homogenous tree stands that are the result of past clearcut harvests).

5.      Nearly 4,000 acres of the CCR Project area, however, are properly functioning mature and old growth forest not in need of restoration, much of which is providing high-quality habitat for northern spotted owls. Available scientific literature does not support using commercial logging prescriptions in mature and old growth forests, especially moist mixed conifer forest, to artificially manipulate vegetation conditions and ecosystem processes currently within their natural range of variability.

6.      The majority of this mature and old growth forest is in Fire Regime Condition Class 1, which means vegetation conditions are within their natural range of variability with respect to fuel loads, fire frequency and intensity. According to the Forest Service's draft Environmental Assessment ("EA"), as much as 96% of the project area's "moist mixed conifer forest" is in Condition Class 1. A substantial amount of the dry mixed conifer forest is also already within its natural fire regime.

7.      Additionally, the CCR Project area is outside the areas identified as a high priority for vegetation management in both the local community's wildfire protection plan and the Mt. Hood Strategic Fuel Placement Plan.

8.      Because the Forest Service approved commercial logging for thousands of acres of critical spotted owl habitat that does not need restoration, Plaintiffs hereby challenge the agency's June 27, 2018 decision authorizing the CCR Project for violations of federal laws and regulations intended to protect the public's natural resources and ensure informed, well-reasoned decision-making.

3 - COMPLAINT

9.      This action seeks: 1) a declaration that the Forest Service violated the National

Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and its implementing regulations

by a) failing to prepare an Environmental Impact Statement (EIS), b) failing to develop and

analyze an adequate range of alternatives, and c) otherwise failing to take the requisite 'hard

look' at the project's potential environmental impacts; 2) a declaration that the Forest Service

violated the National Forest Management Act (NFMA) 16 U.S.C. §1600 *et seq*. and its

implementing regulations by authorizing a project that is inconsistent with the governing Forest

Plans because it fails to follow management guidelines for  Late Successional Reserves and snag

retention standards; 3) a declaration that the Forest Service violated the Travel Management Rule

("TMR"), 36 C.F.R. § 212.5 *et seq*. by a) improperly claiming to have identified a minimum road

system without addressing or explaining how the identified system is based on the factors listed

at 36 C.F.R. § 212.5(b), and b) by failing to explain how the revised designations of roads and

other motor vehicle routes consider effects on forest resources and other criteria outlined in 36

C.F.R. § 212.55(a); and 4) an injunction prohibiting the Forest Service, its contractors, assigns,

and other agents from proceeding with the contested portions of the CCR Project, unless and

until this Court determines that the violations of law set forth herein have been corrected.  The

requested relief is necessary to preserve the status quo, to prevent illegal agency action, and to

forestall irreparable injury to the environment.

10.     In the event that Plaintiffs are the prevailing party in this action, they will seek an award

of fees and costs pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412.

## JURISDICTION AND VENUE

11.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 2201

(injunctive relief), 2202 (declaratory relief), and 28 U.S.C. § 1346 (United States as a defendant).

This cause of action arises under the laws of the United States, including the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*; the National Forest Management Act (NFMA), 16 U.S.C. §1600 *et seq.*; and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.* An actual, justiciable controversy exists between Plaintiffs and Defendant, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

12.    Venue in this court is proper under 26 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Plaintiffs and Defendant reside in this district, and the public lands and resources at issue are located in this district. The Forest Supervisor of Mt Hood National Forest headquartered in Sandy, Oregon, authorized the implementation of this decision. Plaintiffs Bark, WildEarth Guardians and Oregon Wild have offices in Portland, Oregon. Plaintiff Cascadia Wildlands has an office in Eugene, Oregon. Pursuant to Local Rule 3-2(b), this case is properly filed in the Court's Portland Division in Portland, Oregon.

## PARTIES

13.    Plaintiff BARK is a grassroots non-profit organization with approximately 30,000 supporters, dedicated to protecting and restoring the forests, waters, and wildlife of Mt. Hood National Forest and surrounding public lands. Through on-the-ground monitoring, education, and outreach, Bark works to ensure that public forests are managed for the public interest. Central to Bark's philosophy is public engagement, which Bark promotes by involving people in monitoring and participating in federal timber sale planning to ensure compliance with federal environmental laws. Bark and its members actively participate in government decision-making processes on Forest Service-managed public lands in Northwest Oregon.

14.     Plaintiff Bark's members, officers, and staff hike, camp, bird watch, view wildlife, gather mushrooms, and engage in other vocational, educational, scientific, religious, and recreational activities in and around the Mt. Hood National Forest and surrounding public lands, including the White River watershed where the CCR Project is proposed.

15.     Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest.  Oregon Wild and its members are dedicated to protecting and restoring Oregon's wild lands, wildlife, and waters as an enduring legacy.

16.     Oregon Wild's staff and members regularly visit the CCR Project area and surrounding federal lands and seek to ensure that the Forest Service faithfully and fully implements and complies with federal law in managing the natural resources of the CCR Project area as a means of protecting their interests.  Oregon Wild's staff and members hike, camp, photograph scenery and wildlife, use, and engage in other vocational, scientific, and recreational activities in and around the CCR Project area.  Oregon Wild's staff and members derive recreational, inspirational, scientific, and aesthetic benefit from their activities within the CCR Project area. Oregon Wild's staff and members intend to continue to use and enjoy the CCR Project area and surrounding forested lands, waters, and canyons frequently and on an ongoing basis in the future.

17.     Plaintiff WILDEARTH GUARDIANS is a non-profit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. WildEarth Guardians has more than 220,000 members and supporters across the American West, including many in Oregon.  WildEarth Guardians maintains an office in Portland, Oregon. WildEarth Guardians has organizational interests in the proper and lawful management of National Forest lands, including management of the forest road system and its associated impacts

on wildlife and wild places, on Mt. Hood National Forest.  WildEarth Guardians and its members

have a procedural interest in ensuring that all Forest Service activities comply with all applicable

federal statutes and regulations. WildEarth Guardians has participated in Forest Service decision-

making on Mt. Hood National Forest to improve management of the lands and road system.

18.     WildEarth Guardians' members and staff derive aesthetic, recreational, scientific,

inspirational, educational, and other benefits from recreating on Mt. Hood National Forest within

the CCR Project area. WildEarth Guardians' members and staff regularly recreate in areas of Mt.

Hood National Forest where the CCR Project will impact wildlife and wild places. WildEarth

Guardians' members recreate in these areas for the purposes of hiking, camping, recreation, bird

watching, boating, photography, observing—or attempting to observe—wildlife such as

Northern spotted owl, Oregon spotted frog, gray wolf, bald eagle, osprey, and other recreational

and professional pursuits. The opportunity to possibly view these species, or their sign, on Mt.

Hood National Forest is of significant interest and value to WildEarth Guardians' members and

staff and increases their use and enjoyment these areas.  WildEarth Guardians' members and

staff have engaged in these activities in the past and intend to do so again in the near future.

19.     Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in

Eugene, Oregon, with approximately 10,000 members and supporters throughout the United

States.  Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore

wild ecosystems in the Cascadia Bioregion, extending from Northern California up into Alaska.

Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in

the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia

Bioregion.

20.     Cascadia Wildlands' members have used and will continue to use the CCR Project area for activities such as hiking, bird watching, and other recreational and professional pursuits.

21.     All Plaintiffs have organizational interests in the proper and lawful management of public lands in Mt. Hood National Forest. Plaintiffs' aesthetic, recreational, scientific, and religious interests have been and will be adversely affected and irreparably injured if Defendant engages in activities detrimental to forest ecosystems and late successional habitat in the project area. Plaintiffs' and their members will not have the ability to use and enjoy the CCR Project area if it is logged. Plaintiffs' injuries are also predicated on unlawful Forest Service actions which have: diminished the trust between the conservation community and the Forest Service; facilitated the risk of unsupported and uninformed management and decision-making; compromised the Forest Service's ability to prohibit and mitigate harm to the public lands and wildlife of the CCR Project area from commercial logging; increased the risk of actual, threatened, and imminent environmental harm; and created actual, concrete injuries to Plaintiffs and their interests. Because Plaintiffs seek to ensure informed decision-making, compliance with federal law, and the prevention of unacceptable harm to the Project area and the native species that occupy it from logging, Plaintiffs' injuries would be redressed by the relief sought.

22.     Plaintiffs all commented and submitted pre-decisional objections on the CCR Project, alleging, among other issues, that the Forest Service's failure to adequately analyze the impacts of, or explore alternatives to, this timber sale and its failure to comply with the substantive requirements of NFMA violated federal law.

23.     Defendant UNITED STATES FOREST SERVICE is an agency or instrumentality of the United States and is charged with managing the public lands and resources of the Mt. Hood National Forest in accordance and compliance with federal laws and regulations.

## STATEMENT OF LAW

<u>National Forest Management Act</u>

20.    In 1976, Congress enacted the National Forest Management Act (NFMA) 16 U.S.C.

§1600 *et seq*., which governs the Forest Service's management of the National Forests.  NFMA

establishes a two-step process for forest planning.  It first requires the Forest Service to develop,

maintain, and revise Land and Resource Management Plans (LRMP or Forest Plan) for each

national forest. 16 U.S.C. § 1604(a).  The Forest Plan guides natural resource management

activities forest-wide, setting standards, management goals and objectives, and monitoring and

evaluation requirements.

21.    Once a Forest Plan is in place, site-specific actions are planned and evaluated by the

Forest Service.  All site-specific decisions must be consistent with the broader Forest Plan. 16

U.S.C. § 1604(i).  The Mt. Hood National Forest Land and Resource Management Plan (Forest

Plan) was adopted in 1990.

22.    In 1994, the Forest Service and Bureau of Land Management (BLM) issued the Record of

Decision for the Northwest Forest Plan (NWFP).  The NWFP established management

requirements for all Forest Service and BLM land within the range of the northern spotted owl.

The Mt. Hood National Forest lies within the range of the northern spotted owl and all

management practices must conform to the requirements of the NWFP.

23.    The NWFP amended all pre-existing National Forest LRMPs, so that both the 1990 Mt.

Hood Forest Plan and the NWFP guide Mt. Hood's management.  In the event that there are

differences in management guidelines between the two documents, the NWFP controls.

24.    The NWFP created six different land allocations, each with different management

priorities and governed by different standards and guidelines.  Of particular relevance to the

9 - COMPLAINT

current case is land allocated as Late-Successional Reserves ("LSRs"), which are managed to protect and enhance conditions of late-successional and old-growth forest ecosystems to serve as habitat for late-successional and old-growth related species.

25.     Overlapping the NWFP land allocations are the management area designations of the Mt. Hood Forest Plan.  In the CCR Project area there are 4,354 acres of "Scenic Viewshed," 2,161 acres of "Deer & Elk Winter Range" and 5,557 acres of "Timber Emphasis."

26.     In addition to land designations, the Mt. Hood Forest Plan contains substantive standards that guide the Forest Service's management of the forest resources on Mt. Hood National Forest. As defined by the Plan, each standard falls into one of three categories of management flexibility.  "Shall" standards are mandatory.  "Should" standards are required, but case by case exceptions are acceptable if identified during project planning and environmental analyses. "May" standards are optional.

27.     The Mt. Hood Forest Plan requires that wildlife trees should be maintained to support 60% of maximum biological potential of cavity nesting species.  If the analysis area is deficient in providing sufficient quantity and/or quality of wildlife trees, new timber harvest units shall include enough wildlife trees to compensate for the deficiency.

National Environmental Policy Act

28.     Congress enacted the National Environmental Policy Act (NEPA) in 1969, directing all federal agencies to assess the environmental impacts of proposed actions that have the potential to significantly affect the quality of the environment.  42 U.S.C. § 4332(2)(C).  NEPA's disclosure goals are two-fold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) to ensure that the public has sufficient information to meaningfully participate in the decision-making process.

29.     The Council on Environmental Quality (CEQ) promulgated uniform regulations implementing NEPA that are binding on all federal agencies.  42 U.S.C. § 4342, 40 C.F.R. §§ 1500 *et. seq.*

30.     NEPA requires federal agencies to prepare, consider, and approve an adequate Environmental Impact Statement (EIS) for "any major federal action significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1501.4(a)(1).

31.     To determine whether an action requires an EIS as required by NEPA, an action agency may prepare an Environmental Assessment (EA).  40 C.F.R. § 1501.4(b).  An EA should be a concise public document that briefly describes the proposal, examines reasonable alternatives, considers environmental impacts, and provides a listing of individuals and agencies consulted.  40 C.F.R. § 1508.9.  If the agency decides that an EIS is not needed, it must undertake a thorough environmental analysis and supply a convincing statement of reasons that explains why a project's impacts are not significant.

32.     To make a supportable determination of non-significance, NEPA documents must consider the direct, indirect, and cumulative environmental impacts of a proposed action.  40 C.F.R. § 1508.8.  Direct effects are caused by the action and occur at the same time and place as the proposed project.  *Id.* § 1508.8(a).  Indirect effects are caused by the action and are later in time or farther removed in distances but are still reasonably foreseeable.  *Id.* § 1508.8(b).  Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]."  *Id.* § 1508.  Cumulative impact results when the "incremental impact of the action [is] added to other past, present, and reasonably foreseeable future actions" undertaken by any person or agency.  *Id.*  § 1508.7.

33.     NEPA requires that environmental information be available to public officials and citizens before agency decisions are made and before any actions occur to implement the proposed project.  40 C.F.R. § 1500.1(b).  The information released must be of high quality and sufficient to allow the public to question the agency rationale and understand the agency's decision-making process.  *Id.*

34.     NEPA also requires agencies to consider a range of alternatives to each proposed action. The agency's analysis must consider the underlying "purpose and need" for the proposed action, and "rigorously explore and objectively evaluate" the environmental impacts of "all reasonable alternatives" to the proposed action.  40 C.F.R. §§ 1502.13, 1502.14.  The alternatives analysis is "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  *Id*. § 1502.14.  This requirement is critical to serving NEPA's primary purposes of ensuring fully informed decisions and providing for meaningful public participation in environmental analyses and decision-making.  *Id*. § 1500.1(b), (c).

35.     Recent Forest Service NEPA regulations suggest that, only if there are no unresolved conflicts concerning alternative uses of available resources, an EA may analyze just the proposed action and proceed without consideration of additional alternatives.  36 CFR § 220.7(b)(2)(i).

Endangered Species Act

36.     Under the Endangered Species Act (ESA), the U.S. Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service ("NMFS") (collectively "the Services") must list a species as endangered if it is in danger of going extinct throughout all or a significant portion of its range and must list it as threatened if it is likely to become endangered in the foreseeable future. 16

U.S.C. §§ 1532(6), (20); 1533(a)(1).[2]  The Services may also list sub-species or distinct

populations of fish or wildlife as threatened or endangered under the ESA.  *Id.* § 1532(16).

37.     Once species are listed as threatened or endangered, the Services must designate critical

habitat, which is occupied or unoccupied habitat that contains physical or biological features

essential to the conservation of the species and which may require special management

considerations or protection.  *Id.* §§ 1532(5); 1533(a)(3).  The intent of the ESA is to conserve

ecosystems upon which threatened and endangered species depend and recover listed species to

the point at which they no longer need the protections of the Act.  *Id.* §§ 1531(b); 1532(3).

38.     A federal agency that authorizes an activity that may affect a listed species or critical

habitat must consult with the Services over the impacts of that activity to ensure that it does not

jeopardize the continued existence of the species or result in the destruction or adverse

modification of critical habitat.  16 U.S.C. § 1536(a)(2).  Jeopardize means to reduce appreciably

the likelihood of both the survival and recovery of the species in the wild by reducing the

reproduction, numbers, or distribution of the species.  50 C.F.R. § 402.02.  Destruction or

adverse modification is a direct or indirect alteration that appreciably diminishes the value of

critical habitat for both the survival and recovery of a listed species.  *Id.*

39.     During the ESA consultation process, if the action agency concludes in a Biological

Assessment ("BA") that the activity is "not likely to adversely affect" the listed species or

adversely modify its critical habitat, and the Service concurs with that conclusion, the

consultation is complete.  *Id*. §§ 402.12, 402.14(b).  If, however, the action agency or the Service

determines that the activity **is** "likely to adversely affect" the listed species or its critical habitat,

---

[2] U.S. Fish and Wildlife Service is responsible for consultations involving freshwater aquatic species, such as bull trout, while NMFS/NOAA Fisheries is responsible for consultations involving marine species, such as salmon and steelhead.

then the Service completes a Biological Opinion ("BiOp") to determine whether the activity will jeopardize the species or result in destruction or adverse modification of critical habitat. *Id.* § 402.14. If the Service determines that the action will jeopardize the species or adversely modify critical habitat, it may propose one or more reasonable and prudent alternative actions that would avoid such results. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5).

Travel Management Rule

40.    The Forest Service promulgated the Roads Rule (referred to as "subpart A" of the Travel Management Rule) in 2001. 66 Fed. Reg. 3206 (Jan. 12, 2001); 36 C.F.R. part 212, subpart A. Subpart A is meant to close the gap between the agency's limited resources and the maintenance required to keep up its oversized and deteriorating road system. It sets out two important obligations for the agency: (1) Identify the minimum road system ("MRS") needed for safe and efficient travel and for the protection, management, and use of National Forest system lands; and (2) Identify unneeded roads to prioritize for decommissioning or to be considered for other uses. 36 C.F.R. § 212.5(b). The MRS is the road system that is necessary to meet resource and other management objectives adopted in the relevant Forest Plan. *Id.* Designation of the MRS and road decommissioning must be accomplished by completing a "science-based roads analysis at the appropriate scale," and incorporating, to the degree practicable, the interests of affected citizens and state, local, and tribal governments. *Id.* § 212.5(b)(1). This process results in a "travel analysis report", which sets forth a recommended MRS for the forest. The Forest Service must then identify the MRS for a given area through subsequent site-specific agency actions subject to NEPA review, such as a large-scale timber sale project. MHNF completed its forest-wide travel analysis report in 2015.

41.     The Forest Service must "identify the [MRS] needed for safe and efficient travel and for administration, utilization, and protection of National Forest System lands." 36 C.F.R. § 212.5(b)(1).  Subpart A defines the MRS as "the road system determined to be needed to meet resource and other management objectives adopted in the relevant land and resource management plan. . .  to meet applicable statutory and regulatory requirements, to reflect long-term funding expectations, to ensure that the identified system minimizes adverse environmental impacts associated with road construction, reconstruction, decommissioning, and maintenance." *Id.*

42.     If the Forest Service revises the designations of National Forest System roads, trails or areas in authorizing a site-specific action, such as a timber sale, it must do so in accordance with the criteria in 36 C.F.R. § 212.55.  36 C.F.R. § 212.54.

43.     The Travel Management Rule states general and specific criteria the Forest Service must consider and apply when designating roads, trails, and areas for motor vehicle use on National Forests with the objective of minimizing damage to forest resources, harassment of wildlife, disruption of wildlife habitat, and conflicts with other recreational uses.  36 C.F.R. § 212.55. The general criteria require the Forest Service to "consider effects on National Forest System natural and cultural resources, public safety, provision of recreation opportunities, access needs, conflicts among uses of National Forest System lands, the need for maintenance and administration of roads, trails, and areas that would arise of the uses under consideration of designated; and the availability of resources for that maintenance and administration." *Id.* § 212.55(a).

///

///

15 - COMPLAINT

Administrative Procedure Act

44.     The Administrative Procedure Act (APA) confers a right of judicial review on any person that is adversely affected by federal agency action.  5 U.S.C. § 702.  Upon review, the court shall "hold unlawful and set aside agency actions . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).

## STATEMENT OF FACTS

**The Threatened Northern Spotted Owl**

45.     The lands affected by the CCR Project occur within the range of the Northern Spotted Owl (spotted owl) (*Strix occidentalis caurina*).

46.     The spotted owl occupies late-successional and old growth forest habitat from southern British Columbia through Washington, Oregon, and northern California.  Spotted owls rely on older forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal.  These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly.  Forested stands with high canopy closure also provide thermal cover as well as protection from predation.

47.     Due to concerns over its widespread habitat loss and habitat fragmentation and the lack of regulatory mechanisms to protect the species, the FWS listed the northern spotted owl as a threatened species under the ESA on June 26, 1990. 16 U.S.C. § 1533(a); *Determination of Threatened Status for the Northern Spotted Owl*, 55 Fed. Reg. 26,114 (June 26, 1990) (*codified at* 50 C.F.R. § 17.11(h)).

16 - COMPLAINT

48.     The latest demographic data shows a continuing decline in the overall spotted owl population at a rate of three percent every year.

49.     Critical habitat was designated for the species in 1992 and revised in 2008.  *Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl; Final Rule*, 73 Fed. Reg. 47,325 (Aug. 13, 2008).  In response to litigation, a second revision of northern spotted owl critical habitat was prepared and finalized in 2012. *Endangered and Threatened Wildlife and Plants; Designation of Revised Critical habitat for the Northern Spotted owl*; Final Rule, 77 Fed. Reg. 71,876 (Dec. 4, 2012).

50.     In April 1992, the FWS issued a draft recovery plan for the northern spotted owl.  In 2008, the FWS issued a revised final recovery plan.  That recovery plan was challenged in court, and the FWS subsequently published a final revised recovery plan for the owl on July 1, 2011. *Endangered and Threatened Wildlife and Plants; Revised Recovery Plan for the Northern Spotted Owl (Strix occidentalis caurina)*, 76 Fed. Reg. 38,575 (July 1, 2011).  The 2011 Revised Recovery Plan identified competition with barred owls and the ongoing loss of spotted owl habitat from logging as two of the current leading range-wide threats to the spotted owl's survival and recovery.

51.     The entire CCR Project is located within spotted owl Critical Habitat Unit Eastern Cascades North, sub-unit 7 (ECN 7).  This sub-unit covers 139,983 acres, mostly in Hood River and Wasco Counties.  It is characterized by a continental climate (cold, snowy winters and dry summers) and a high frequency of natural disturbances due to fires and outbreaks of forest insects and pathogens.  *USFWS, Designation of Revised Critical Habitat for the Northern Spotted Owl, 2012, 119-120.*

52.   According to the FWS's BiOp for the CCR Project, the condition of this Critical Habitat

Unit is degraded due to decades of high levels of timber harvest and the ongoing expansion of

the barred owl population into spotted owl habitat.

53.   The rule designating this forest as Critical Habitat determined that all of the unoccupied

and likely occupied areas in this subunit are **essential** for the conservation of the species to meet

the recovery criterion that calls for the continued maintenance and recruitment of northern

spotted owl habitat.  In its Revised Critical Habitat designation, the FWS recommended that land

management agencies focus active management in younger forests, lower quality owl habitat, or

where ecological conditions are most departed from the natural or desired range of variability.

**Mt. Hood National Forest's Crystal Clear Restoration Project**

54.   The Forest Service issued the public "scoping" notice for the CCR Project on March 1,

2017 describing the purpose and need for the project as follows: "to provide forest products

where there is an opportunity to restore resiliency to forested areas and reduce the risk of

uncharacteristic wildfire."  To achieve the stated purpose, the Forest Service proposed logging

13,271 acres, including 6,296 acres of moist mixed conifer forest.

55.   Importantly, according to the Wasco County Community Wildfire Protection Plan the

CCR Project area is in Zone 3; recommendations for Zone 3 focus exclusively on protecting

settled communities, of which there are none in the project area.  Because the CCR Project area

is not a priority under the Community Wildfire Plan, nor outside of its natural vegetation

condition class, it is also not a priority area for a large-scale vegetation management project

under the Mt. Hood Strategic Fuel Placement Plan.

56.   District Ranger Kameron Sam first introduced the CCR Project to the Wasco County

Forestry Collaborative Group in September 2016, but informed the group that the sale would not

be collaboratively developed.  Instead, Ranger Sam described the project sale as a "straight up timber sale" with the purpose of creating "shelf stock" of timber to meet Mt. Hood National Forest's annual timber production target.

57.    As documented in the Wasco County Collaborative Group's meeting notes, Ranger Sam reiterated this sentiment at the group's March 2, 2017 meeting, stating: "In the spirit of transparency, the Crystal Clear Restoration Project is receiving priority due the role the timber sale will have on generating revenue for future retained receipts and meeting the district's quota for timber sales."

58.    On August 25, 2017, the Forest Service issued its draft EA for the CCR Project.  All plaintiff organizations filed timely comments on the draft EA with the Forest Service.

59.    On January 12, 2018, the FWS received the Forest Service's letter requesting formal consultation under ESA Section 7 for the impacts of the CCR Project on the following threatened and endangered species and federally designated critical habitat: Northern Spotted Owl, Oregon Spotted Frog and Gray Wolf.   Just one week later, on January 19, 2018, FWS issued a BiOp concurring that the CCR Project was "likely to adversely affect" the spotted owl and its proposed critical habitat due to the loss of the owl's nesting, roosting, and foraging habitat (NRF) and dispersal habitat.  The BiOp also concluded that the project "may affect, but is not likely to adversely affect" the threatened Oregon spotted frog and its critical habitat or the endangered gray wolf.

60.    On February 8, 2018 the Forest Service released its Final EA and draft Finding of No Significant Impact ("FONSI").  In response to Plaintiffs' concerns that the documents were inaccurate and incomplete, the Forest Service withdrew the documents and re-issued them on

February 16, 2018.  All Plaintiff organizations filed timely pre-decisional objections and attended an objection resolution meeting with MHNF staff on May 11, 2018.

61.     On June 4, 2018, interim Forest Supervisor Jim DeMaagd offered to remove 327 acres of logging and accompanying segments of road building.  Plaintiffs, while appreciative of a step in the right direction, did not find this modification sufficient to resolve the violations of law, regulation and policy raised in their objections.

62.     The Forest Service denied the pre-decisional objections on June 18, 2018.  The agency's objection response, however, incorrectly stated that the CCR Project would not log in suitable habitat for NSO.  Plaintiff Bark contacted the MHNF staff and reminded them that the CCR Project decision authorizes removing 1,059 acres of NSO habitat suitable for nesting, roosting and foraging as well as 895 acres of dispersal habitat. The Forest Service re-issued a new objection response correcting this mistake, but again denying all objections on July 18, 2018.

63.     On September 14, 2018, the Forest Service will receive bids for the first 680 acres of logging in the CCR project area, packaged as the Ahoy Stewardship Project.  This sale would log 17,829 CCF of timber (equaling 49,000 tons of Douglas Fir and 3,000 tons of other mixed conifer species).  The area under this contract primarily contains mature and old growth forest, including suitable spotted owl habitat, Late Successional Reserves and forest stands up to 220 years old.

64.     Over the past two years, volunteers for Plaintiffs' organizations spent thousands of hours hiking the proposed CCR Project units, collecting information about the conditions of the forest, waterbodies and roads in the planning area.

65.     Plaintiffs' field information from the CCR Project area showed that, in many of the proposed logging units, the information the Forest Service provided in its NEPA documents did

not match the facts on the ground, especially regarding the baseline conditions of forest stands.

For example, many units appeared to exhibit the exact characteristics that the EA suggests

logging methods would artificially create: a fairly open to very open forest canopy with a diverse

mix of species in the mid-story and understory, including larch, white pine, lodgepole pine,

western hemlock, mountain hemlock, juniper, western red cedar, incense cedar, yew, Douglas

fir, grand fir, noble fir and silver fir.  In units such as 144, 109, 210, 219, 223, the overstory

canopy cover is already far less than 50%, which the CCR EA lists as the desired <u>future</u> canopy

closure after the project.  Additionally, many proposed units are within their natural fire regime

and already have large diameter trees and the other elements of the desired future conditions,

including units 8, 8L, 9, 9L, 104, 375, 447, 470, 471, 472, 473, 474, 475, 478, 479, 504, 505,

507, 508, 509, and 510.

66.     While field checking the CCR Project area, Bark volunteers also identified two Survey &

Manage species, that the NWFP requires the agency to protect: *Cypripedium montanum* and

*Albatrellus flettii*.  To the best of Plaintiffs' knowledge, these sites were not found during earlier

surveys conducted by the agency's resource experts.  Bark staff immediately contacted Forest

Service biologists and shared this information, as well as including it in their comments on the

draft EA and in the pre-decisional objection.

67.     The Forest Service's draft EA for the CCR Project only assessed two alternatives: the

"Proposed Action" and "No Action."  In administrative comments, Plaintiffs recommended the

Forest Service fully analyze other reasonable alternatives, including removing sale units that are

within their natural fire regime, implementing a size limit on trees to be logged, removing units

that degrade existing high-quality spotted owl habitat, and/or reducing the road density in the

project area by decommissioning more roads or building fewer temporary roads.

21 - COMPLAINT

68.     Plaintiffs also raised concerns about the Forest Service's failure to acknowledge: the scientific uncertainty raised in administrative comments concerning the effectiveness of logging to affect future fire behavior; the clear scientific opposition to logging large diameter trees and moist forests for the purpose of affecting fire behavior; and the obvious scientific controversy over logging mature forests to allegedly "improve" spotted owl habitat.

69.     Another concern Plaintiffs raised is the current high road density within the project area, which consists of 162 miles of roads.  Mt. Hood National Forest has funding to maintain or make repairs on only about 15% of its forest-wide road system annually.

70.     The final CCR Decision authorizes building 35.8 miles of temporary roads, 10% of which would be new road construction and roughly 90% (or 32.1 miles) would be re-built on previously disturbed areas, such as old road-bed alignments or off-highway vehicle (OHV) trails. This decision would decommission 0.7 miles of road and close approximately 5.6 miles of road.

71.     In its NEPA analysis, the Forest Service claimed to have identified the minimum road system in its 2015 travel analysis report.  Mt. Hood's 2015 travel analysis report, however, did *not* identify the minimum road system for the forest.  Rather, it provided the information necessary for the Forest Service to make that identification in later site-specific projects, such as timber sales, with those decisions subject to public scrutiny under NEPA.

**Old Forest Habitat for Threatened and Sensitive Wildlife in the CCR Project Area.**

72.     The CCR Project decision authorizes removing 1,059 acres of spotted owl critical habitat that is currently suitable for nesting, roosting and foraging as well as 895 acres of dispersal habitat.  Generally, suitable habitat is comprised of forest stands 80-years or older, with canopy cover above 60%, and multi-storied with sufficient snags and down wood to provide

opportunities for nesting, roosting, and foraging.  The Forest Service estimated that post-project, the logged areas will not provide quality suitable habitat for another 75 to 100 years.

73.     The CCR Project is the fourth timber sale the Forest Service has planned in Critical Habitat Unit ECN 7 in recent years.  The Dalles II project resulted in the loss of 1,360 acres of functional spotted owl habitat for up to 50 years.  An additional 365 acres of owl habitat were degraded by the Government Flats fire and the subsequent logging of the area in the North Fork Mill Creek Timber sale.  Another 1,174 acres of owl critical habitat is slated for logging under the recently authorized Polallie Cooper Timber Sale.

74.     Like federally designated Critical Habitat, land designated as Late-Successional Reserves (LSRs) is managed to protect and enhance conditions of late-successional and old-growth forest ecosystems to serve as habitat for spotted owls and other wildlife dependent upon late-successional forests.

75.     The CCR Project authorizes 440 acres of logging in LSRs.  Proposals for logging inside LSRs are subject to review by the Regional Ecosystem Office (REO) to ensure that the treatments are beneficial to the creation of late-successional forest conditions, as required under the NWFP.  The Mt. Hood Forest Service officials did not consult with the REO regarding the logging in LSRs for the CCR Project.

76.     Four of the CCR Project's logging units (units 5, 7, 9L, and 44L), are located in LSRs that currently provide suitable habitat for the threatened spotted owl.  Three of these units are included for logging in the Ahoy Stewardship contract.

77.     According to the CCR EA, the LSRs in this project are categorized as "Open Park-like, Cathedral and Open Intolerant Multi-story" forest.  Under the agency's White River LSR Assessment, the Desired Future Condition for "Open Park-like" and "Open Intolerant multi-

story" after vegetation management is variable canopy closure (40% to 80%). "Cathedral"

stands should have post-treatment canopy closure greater than 60% but less than 85%. The

White River LSR Assessment further instructs that this canopy cover should be achieved through

"retention of any remnant large diameter trees."

78.     The CCR Project would result in an average post-treatment canopy closure of just 35% in

the LSR units, well below that prescribed in the White River LSR Assessment and below the

canopy closure necessary to provide suitable spotted owl NRF habitat.

79.     The spotted owl and many other wildlife species also depend on large snags (standing

dead trees) to meet their habitat needs. Snags are used extensively by cavity-nesting birds and

mammals such as woodpeckers, nuthatches, chickadees, squirrels, red tree voles, and American

marten. As the NWFP provides, the removal of snags can reduce the carrying capacity for these

species for many years. Currently, snags per acre within the White River Watershed are below

historic levels.

80.     As proposed, the CCR Project would remove existing snags during harvest operations,

temporary road construction, road decommissioning, road closure, and storm proofing due to

safety considerations, as well as increasing their propensity to fall after thinning.

81.     As the draft EA acknowledged, in addition to felling existing snags, the CCR Project

would remove most of the trees which would naturally die from suppression mortality and create

snags, thereby decreasing the amount of future snags.

### FIRST CLAIM FOR RELIEF

### (Violation of NEPA and 5 U.S.C. § 706(2)(A))

82.     Plaintiffs reallege and incorporate by reference the preceding paragraphs. NEPA and its

implementing regulations require federal agencies to take a hard look at the environmental

24 - COMPLAINT

consequences of proposed actions and the reasonable alternatives that would avoid or minimize

such impacts or enhance the quality of the human environment.  *See* 42 U.S.C. § 4332(2)(C)(i);

40 C.F.R. Parts 1502 and 1508.

83.     An EA must provide sufficient information for determining whether to prepare an EIS or

issue a finding of no significant impact.  40 C.F.R. § 1508.9(a).  The information presented in the

EA must be of "high quality," and include "accurate scientific analysis."  40 C.F.R. 1500.1(b).

The agency must adequately explain its decision not to prepare an EIS by supplying a convincing

statement of reasons why potential effects are insignificant.

84.     Federal agencies must prepare an EIS for any federal action that may have a significant

environmental effect.  42 U.S.C. § 4332.

85.     In determining whether a proposed action may "significantly" impact the environment,

both the context and the intensity of the action must be considered.  40 C.F.R. § 1508.27.

94.     In evaluating intensity, the agency must consider numerous "significance" factors,

including impacts that may be both beneficial and adverse; the unique characteristics of the

geographic area such as ecologically critical areas; the degree to which the effects on the quality

of the human environment are likely to be highly controversial; the degree to which the possible

effects on the human environment are highly uncertain or involve unique or unknown risks;

whether the action is related to other actions with individually insignificant but cumulatively

significant impacts; the degree to which the action may adversely affect an endangered or

threatened species or its critical habitat; and whether the action threatens a violation of Federal,

State, or local law or requirements imposed for the protection of the environment.  40 C.F.R. §

1508.27(b).

95.     If the agency's action may be environmentally significant according to any of the criteria,

the agency must prepare an EIS.

96.     The Forest Service has violated NEPA and its implementing regulations through issuance of the Crystal Clear Restoration Project EA/FONSI and Decision Notice.  These violations include, but are not limited to:

a.) Failing to prepare an EIS prior to authorizing the challenged decision, instead relying upon the issuance of a FONSI, when several of NEPA's "significance" finding factors exist with respect to the CCR Project.  For example: authorizing commercial logging in ecologically critically areas (i.e. LSRs); adversely affecting the spotted owl and its critical habitat by removing 1,059 acres of suitable NRF habitat and 895 acres of dispersal habitat for the long-term, possibly a century; logging mature and old growth forest that is already properly functioning habitat within historical fire regime in an attempt to influence fire behavior is highly controversial and involves a high degree of scientific uncertainty; and the effects of this large-scale timber sale, when combined with past and reasonably foreseeable future timber sales in the same critical habitat unit may result in a cumulatively significant environmental impact.  40 C.F.R. § 1508.27(b);

b.) Failing to thoroughly consider and objectively evaluate an adequate range of reasonable alternatives, including alternatives that would better meet the stated "purpose and need" of the project to produce timber volume as a byproduct of enhancing forest resiliency and reducing fuel loads by thinning plantations, saplings, and other areas that have departed from properly functioning ecological conditions, without commercially logging mature and old growth forest, particularly moist mixed conifer forest already within its natural range of variability and currently serving as suitable spotted owl NRF habitat and with less road construction/re-construction;

c.) Failing to provide the high-quality data and analysis necessary to support its FONSI for the CCR Project. This includes, but is not limited to: incomplete data, unsupported conclusions or contradictory findings, inaccurate baseline conditions for the project area, and the failure to incorporate the best available science;

d.) Failing to sufficiently disclose and evaluate direct, indirect and cumulative impacts of the proposed action and cumulative actions;

e.) Failing to consider important factors and take the requisite "hard look" at environmental impacts, including but not limited to: impacts to threatened species and other wildlife, climate change, road density, and fire behavior.

86.    This claim is brought pursuant to the judicial review provision of the APA, 5 U.S.C. § 706(2).

87.    These violations of NEPA are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, which has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

## SECOND CLAIM FOR RELIEF

## (Violation of NFMA and 5 U.S.C. § 706(2)(A))

88.    Plaintiff incorporates by reference all preceding paragraphs.

89.    The Forest Service's approval of the CCR Project must be consistent with the Mt. Hood Forest Plan, as amended by the NWFP. 16 U.S.C. § 1604(i). The Forest Service violated the NFMA and its implementing regulations by authorizing a project that is inconsistent with the applicable Forest Plan management directives. For example, but not limited to:

a.    Failing to comply with, or assess compliance with, forest-wide standards for snag density, MHNF Forest Plan at FW-215 & 216;

b.      Failing to comply with the NWFP's requirement to consult with the Regional

Ecosystem Office before approving commercial logging in Late Successional Reserves;

c.      Failing to follow management guidelines for LSRs to enhance habitat for

dependent species.

90.      This claim is brought pursuant to the judicial review provision of the APA, 5 U.S.C. §

706(2).

91.      These violations of NFMA are arbitrary, capricious, an abuse of discretion, and not in

accordance with law under the APA, which has caused or threatens serious prejudice and injury

to Plaintiffs' rights and interests.

### THIRD CLAIM FOR RELIEF

### (Violation of Travel Management Rule and 5 U.S.C. § 706(2)(A))

92.      Plaintiffs incorporate by reference all preceding paragraphs.  The CCR Project

EA/FONSI and Decision Notice violate the Travel Management Rule, 36 C.F.R. § 212.5 *et seq.*

because the agency improperly claimed in its Decision Notice to have identified a minimum road

system without addressing or explaining how the identified system is based on the factors listed

at 36 C.F.R. § 212.5(b).  The Decision Notice states that the agency "conducted a sufficient

project-level analysis of the transportation system and that the resulting network of both open

and closed system roads within the project area is the minimum necessary to manage the land."

Neither the selected alternative nor the action alternative propose a road system that conforms to

the regulatory requirements of a "minimum road system" as set forth in 36 C.F.R. § 212.5(b).

For example, the agency failed to consider, or explain, how the identified road system is

consistent with the Forest Plan, minimizes adverse environmental impacts, or meets the long-

term funding expectations of MHNF.  By claiming it identified the minimum road system for the

first time in its Decision Notice, the agency failed to incorporate, to the degree practicable, the

interests of affected citizens and state, local, and tribal governments during the NEPA process.

Nor did the Forest Service explain how its revised designations of roads and other motor vehicle

routes considered effects on forest resources and other criteria outlined in 36 C.F.R. § 212.55.

93.    The Forest Service's failure to properly identify a "minimum road system" that meets the

regulatory requirements and failure to explain how its revised designations considered effects on

forest resources and other regulatory criteria is therefore arbitrary, capricious, an abuse of

discretion, and not in accordance with the law and procedures required by law.  5 U.S.C. §

706(2)(A), (D).

## PLAINTIFFS' PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.  Adjudge and declare that the Defendants' approval of the CCR Project violates NEPA,
    NFMA, those statutes' implementing regulations, and the agency's travel management
    regulations, and thus are arbitrary, capricious, an abuse of discretion, and contrary to law
    under the judicial review standards of the APA, 5 U.S.C. § 706(2);

b.  Hold unlawful and set aside the Decision Notice, FONSI and EA for the CCR Project,
    and order the Defendants to withdraw the DN, FONSI and EA and any associated
    contracts until such time as Defendants demonstrate that they have complied with the
    law;

c.  Order Defendants to revise the CCR Project so that it meets with the requirements of
    NFMA, the NWFP and the Mt. Hood Forest Plan;

d.  Order Defendants to prepare an EIS or, at a minimum, revise its EA to provide adequate
    information upon which to make a finding of significance;

e. Enjoin Defendants and their contractors, assigns, and other agents from proceeding with commercial logging prescriptions for areas outside plantations, specifically those areas classified as mature and old growth forest that are providing spotted owl habitat and/or are otherwise not in need of restoration unless and until the violations of federal law set forth herein have been corrected;

f. Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Plaintiffs;

g. Award Plaintiffs its costs of suit, reasonable expenses and attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

h. Grant such further relief as the Court deems just and equitable in order to provide Plaintiffs with relief and protect the public interest.

Respectfully submitted this 10th   day of September, 2018.


Brenna Bell

Bark
P.O. Box 12065
Portland, OR 97212
(503) 331-0374
brenna@bark-out.org


Jennifer R. Schwartz

Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, OR 97239
(503) 780-8281
jenniferroseschwartz@gmail.com


30 - COMPLAINT

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRCP 7.1, Plaintiffs disclose that they do not have parent corporations, nor do the

Plaintiff organizations have stock.


Brenna Bell
Attorney for Plaintiffs
Bark
P.O. Box 12065
Portland, OR 97212
(503) 331-0374
brenna@bark-out.org

31 - COMPLAINT