Brenna Bell (OSB #01519)
Bark
P.O. Box 12065
Portland, OR 97212
Tel: 503-331-0374
brenna@bark-out.org

Jennifer R. Schwartz (OSB #072978)
Law Office of Jennifer R. Schwartz
2521 SW Hamilton Court
Portland, Oregon 97239
Tel: 503-780-8281
Email: jenniferroseschwartz@gmail.com

Nicholas S. Cady (OSB #113463)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
Tel:  541-434-1463
Email: nick@cascwild.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
# PORTLAND DIVISION

| | |
|---|---|
| **BARK, CASCADIA WILDLANDS, OREGON WILD, AND WILDEARTH GUARDIANS,** | Case No.: 3:18-cv-01645-MO |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT MOTION** |
| v. | |
| **U.S. FOREST SERVICE**, | Oral Argument Requested |
| Defendant, | |
| and | |
| **HIGH CASCADE, INC.,** | |
| Defendant-Intervenor. | |

# TABLE OF CONTENTS

Table of Authorities…………………………………………………………………………iii

List of Acronyms…………………………………………………………………………....vi

**INTRODUCTION**………………………………………………………………………1

**ARGUMENT**……………………………………………………………………………..4

**I.     DEFERENCE IS LIMITED TO DECISIONS
        SUPPORTED BY THE RECORD**……………………………………………..4

**II.    THE FOREST SERVICE VIOLATED NEPA**………………………………...8

        **A. An Environmental Impact Statement is Required**……………………………...4

        1.  A Substantial Dispute about the Project's "Nature" and "Effects" Exists…………5

            a.  *Mischaracterizing the commercial logging of large trees, mature and old-growth
                forests as "restorative" and claiming it will reduce the risk of a high-severity
                wildfire is highly controversial and dubious from a scientific perspective*...………5

            b.  *Alleging the spotted owl will benefit from commercially logging older forests in
                designated critical habitat is highly controversial and scientifically uncertain*…10

        2.  Plaintiffs Raised Substantial Questions as to Whether the CCR Project May
            Significantly Impact NSO Critical Habitat…………………………………………..11

        3.  The Potential for a Cumulatively Significant Impact Exists…………………………15

        4.  The CCR Project Adversely Affects Ecologically Critical Areas……………………16

        5.  The CCR Project Violates Other Legal Requirements………………………………17

        **B. Failure to Take the Requisite 'Hard Look' at Other Key Concerns**……………17

        1.  Inadequate Cumulative Impacts Analysis……………………………………………18

        2.  The USFS Improperly Limited the Scope of Its Cumulative Impacts
            Analysis for the NSO and its Critical Habitat………………………………………..20

        3.  Failure to Establish an Accurate Environmental Baseline…………………………...23

        4.  Failure to take a Hard Look at Climate Change………………………………………25

    **C. Failure to Consider Reasonable Alternatives**……………………………………..28

**III.**    **THE FOREST SERVICE VIOLATED NFMA**…………………………………….30

    **A.**  **Logging in the White River LSR Violates the Northwest Forest Plan**……………………………………………...30

    1.  The Authorized Logging Does Not Follow the White River LSR Assessment……..31

    2.  The Authorized Logging Does Not Follow NWFP Standards & Guidelines………..31

    3.  Consistency Review Does Not Correct Violations of the NWFP………………....32

    **B.**  **The CCR Project is Inconsistent with Forest Plan Snag Retention Standards**………………………………………………………33

**IV.**    **THE FOREST SERVICE FAILED TO COMPLY WITH THE TMR**…………….35

**CONCLUSION**……………………………………………………………………………39

# TABLE OF AUTHORITIES

**Cases**

*AquAlliance v. U.S. Bureau of Reclamation*,
    287 F.Supp.3d 969 (E.D. Cal. 2018)……………………………………………………27

*Anderson v. Evans*,
    314 F.3d 1006 (9th Cir. 2002). ……………………………………………………12

*Blue Mts. Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998)……………………………………………………passim

*Cascadia Wildlands v. U.S. Forest Serv.*,
    937 F. Supp.2d 1271 (D. Or. 2012)……………………………………………5, 14, 16

*City of Tenakee Springs v. Clough*,
    915 F.2d 1308 (9th Cir.1990)……………………………………………………22

*Conservation Cong. v. U.S. Forest Serv.*,
    235 F.Supp.3d 1189 (2017)……………………………………………………...8, 14

*Conservation Cong. v. U.S. Forest Serv.*,
    2018 WL 2427640 (E.D. Cal. May 29, 2018)……………………………………………8

*Ctr. for Biol. Diversity v. Bureau of Land Mgmt.*,
    422 F.Supp.2d 1115 (N.D. Cal. 2006)……………………………………………...23

*Earth Island Inst. v. Forest Serv.*,
    697 F.3d 1010 (9th Cir. 2012)……………………………………………………30

*Hapner v. Tidwell*,
    621 F.3d 1239 (9th Cir. 2010)……………………………………………………..25-27

*Idaho Sporting Cong. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002)……………………………………………………...20, 22

*Klamath-Siskiyou Wildlands Ctr. v. Boody*,
    468 F.3d 549 (9th Cir. 2006)……………………………………………………4, 15

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004)……………………………………………………18-20

*Klamath-Siskiyou Wildlands Ctr. v. Grantham*,
    No. 2:18-cv-02785-TLN-DMC (E.D. Cal. Jan. 25, 2019)………………………………17

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*,
    373 F. Supp. 2d 1069 (E.D. Ca. 2004)……………………………………………...10, 14, 16

*Kern v. Bureau of Land Mgmt.*,
    284 F.3d 1062 (9th Cir. 2002)……………………………………………………20, 22

*League of Wilderness Defenders/Blue Mtns. Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014)……………………………………………………………17

*League of Wilderness Defenders/Blue Mtns. Biodiversity Project v. Connaughton*,
    2014 WL 6977611 (D. Or. Dec. 9, 2014)……………………………………………20-21

*LOWD v. Martin*,
    2011 WL 2493765 (D. OR, June 23, 2011)……………………………………………..25-27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)……………………………………………………………………38

*Nat'l Parks & Conservation Ass'n. v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001)……………………………………………………………4-5

*Native Ecosystems Council v. Dombeck*,
    304 F.3d 886 (9th Cir. 2002)……………………………………………………………22

*Native Ecosystems Council v. Tidwell*,
    599 F.3d 926 (9th Cir. 2010)……………………………………………………………35

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir., 2005)…………………………………………………………30

*Nat'l Parks & Conservation Ass'n. v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001)……………………………………………………10, 12, 21

*N. Idaho Cmty. Action Network v. U.S. Dep't of Trans.*,
    545 F.3d 1147 (9th Cir. 2008)…………………………………………………………..30

*Northwest Coalition for Alternatives to Pesticides v. EPA*,
    544 F.3d 1043 (9th Cir. 2008)……………………………………………………………4

*Ocean Advocates v. Army Corps of Eng'rs*,
    361 F.3d 1108 (9th Cir. 2004)……………………………………………………………4

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*,
    531 F.3d 1114 (9th Cir. 2008)…………………………………………………………...34

*Or. Natural Desert Ass'n v. Jewell*,

840 F.3d 562 (9th Cir. 2016)…………………………………………………………25

*Or. Wild v. Bureau of Land Mgmt.*,
2015 WL 1190131 (D. Or. March 14, 2015)………………………………............passim

*Public Citizen v. Nuclear Regulatory Comm'n*,
573 F.3d 916, 923 (9th Cir. 2009)……………………………………………………34

*Sierra Club v. Bosworth*,
199 F.Supp.2d 971 (N.D. Cal. 2002)………………………………………………….5

*Te-Moak Tribe of W. Shoshone v. Dept. of Interior*,
608 F.3d 592 (9th Cir. 2010)…………………………………………………………18

*W. Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013)………………………………………………….28, 30

**Statutes**

16 U.S.C. § 1604(i)…………………………………………………………………35

**Regulations**

36 C.F.R. § 212.5(b)……………………………………………………………36-38

36 C.F.R. § 219.15(d)……………………………………………………………35

40 C.F.R. § 1500.1(b)………………………………………………………...23, 38

40 C.F.R. § 1502.16…………………………………………………………......38

40 C.F.R. § 1503.4(a)(5)……………………………………………………………38

40 C.F.R. § 1508.8…………………………………………………………………38

40 C.F.R. § 1508.27……………………………………………………………….9

40 C.F.R. § 1508.27(b)…………………………………………………………...13

40 C.F.R. § 1508.27(b)(4)…………………………………………………………5-6

**Other Authorities**

66 Fed. Reg. 3206 (Jan. 12, 2001)………………………………………………38

77 Fed. Reg. 71876 (Dec. 4, 2012)………………………………………………10, 22

REPLY IN SUPPORT OF PLAINTIFFS' SUMMARY JUDGMENT MOTION          v

## LIST OF ACRONYMS

| | |
|---|---|
| BA | Biological Assessment |
| BiOp | Biological Opinion |
| DN | Decision Notice |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| FWS | United States Fish and Wildlife Service |
| LSR | Late-Successional Reserve |
| MHNF | Mount Hood National Forest |
| MRS | Minimum Road System |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NWFP | Northwest Forest Plan |
| NRF | Nesting, roosting and foraging habitat for spotted owl |
| NSO | Northern Spotted Owl |
| OHV | Off-Highway Vehicle |
| LRMP | Land and Resources Management Plan (Forest Plan) |
| ROD | Record of Decision |
| TMR | Travel Management Rule |
| USFS | United States Forest Service |

## INTRODUCTION

In response to Plaintiffs' detailed outline of factual and procedural faults with the CCR Project, Defendant and Intervenor (collectively "Defendants") double down on describing the entire Project as a restoration action based on well-established "silvicultural treatments" and non-controversial science, beset by pesky environmentalists nitpicking the agency to death because they purportedly despise all active management. A careful examination of the record, however, establishes a very different narrative. The Forest Service (USFS) planned the largest commercial timber harvest in old-growth and mature forest in Mt. Hood National Forest (MHNF) in a generation, designed from its inception to produce substantial volume for industry, yet systematically rebranded as "restoration." The agency managed this feat of doublespeak in two main ways: (1) by combining this highly controversial logging of older forests with scientifically sound thinning in plantations and young forests; and (2) by manipulating the specter of high-intensity wildfire, and the badly outmoded assertion that commercial thinning always reduces the risk of such fire, to claim the well-known adverse impacts of industrially logging old forests will essentially be negated by the alleged long-term benefit of increased forest resiliency.

This Court will decide which story rings true. The USFS's Environmental Assessments (EAs) and supporting documents overgeneralize, mischaracterize, and often omit relevant scientific data. The record, however, contains extensive research submitted by the public that undermines the agency's "restoration" fable. This case is important for many reasons: the ecological significance of the lands in question, because the Project's size and impact is without recent local precedent, and because the public should be able to trust that a federal agency is not deceiving them, that agency actions are described and analyzed openly, honestly, and transparently. We respectfully ask this Court to require more integrity of the USFS.

Defendants' responses paint the CCR Project in overly broad strokes.  While there are many acres of dense young forest and commercial plantations where thinning small diameter trees is a well-established practice, which Plaintiffs do not challenge, there are also thousands of acres of mature and old-growth forest where the promise of using commercial logging to restore "resiliency" and reduce fire risk is false.  The sole purpose of logging these late-successional forests – that is anything beyond pre-commercially thinning small "ladder fuels" – is to generate substantial timber volume.  Specifically, here, the agency's commitment in its Timber Sale Pipeline Restoration (TSPR) fund agreement for 100,000 CCF (approximately *double* the *entire forest's* annual timber volume), which Defendants' response briefs pointedly ignored.

The significance of the Project's impacts on these late-successional forests that provide critically important habitat for imperiled species must be considered on its own terms, not diluted or obscured by the uncontested true restoration components of the CCR Project.  Most of these older forest stands have either never been logged, or light management has kept them largely within their natural range of variability.  Defendants attempt to downplay the significance of logging these older forests with silvicultural sleight-of-hand, emphasizing "variable density thinning" (VDT) as a common and benign practice.  While VDT has indeed been commonly used in dry, even-aged stands, applying it to a commercial sale in moist, older forests filled with large trees up to 332 years of age, is unprecedented since the adoption of the Northwest Forest Plan (NWFP).  Rather than glossing over the return of large-scale old-growth logging to MHNF, these actions must be accurately described and analyzed in adequate detail.

Finally, ample scientific research, with which the USFS refused to engage, finds no restorative purpose for logging large, fire-resistant trees from backcountry mature and old-growth forests.  Defendants ignore this record evidence as well as the agency's own models

showing the risk of an *active* crown fire in the Project area is slim to none.  As Defendants'

briefs highlight, there have been 345 human-caused fires in this area in the past twenty years that

collectively affected only 3,600 acres.  Even the Rim fire that started in the Project area during

the exceptionally hot, dry summer of 2017 – the same time as the large Eagle Creek fire in the

Columbia River gorge – burned only 237 acres.[1]  Additionally, there were 118 lightning-ignited

wildfires during this same period, which affected a combined 300 acres.  Importantly, *none* of

these fires erupted into the type of catastrophic mega-fire which Defendants invoke as

justification for large-scale logging.  This is not to say a large fire could never occur in the

Project area, simply that it has experienced hundreds of fires over the past two decades with the

vast majority affecting only a small amount of acreage, without considerable losses to late-

successional forest.  These facts reinforce the growing scientific consensus that moisture and

wind influence fire intensity far more than fuels *per se* and that stands with high canopy closure

and large trees tend to resist drying and block wind.  The naturally denser moist forests that

comprise nearly half the Project area are also not in a WUI or adjacent to any human

communities.  Any fire risk to the nearest community, about 5 miles east of the Project area's

predominantly dry forests, will be reduced by thinning saplings, plantations, and other dry sites

that have significantly departed from their natural fire regime.

 Plaintiffs recognize that past forest mismanagement coupled with global climate change

has increased the magnitude of wildfires across the West.  The record, however, demonstrates a

substantial dispute exists over using this predicament to justify logging ecologically critical old

trees and late-successional forests – "fixing" past mismanagement with present mismanagement.

---

[1]*See* https://inciweb.nwcg.gov/incident/5595/  Note that such acreage generally includes large
proportions of lightly or moderately burned areas in a mosaic.

This controversy, and the USFS's failure to take the requisite hard look at the Project's impacts and other reasonable alternatives, including addressing its travel management obligations, along with its approval of commercial logging that is inconsistent with Forest Plan directives, renders the agency's finding of non-significance and final decision arbitrary and capricious.

## ARGUMENT

## I.    DEFERENCE IS LIMITED TO DECISIONS SUPPORTED BY THE RECORD

While the APA standard of review is deferential, this Court must nonetheless engage in a "thorough, probing, in depth review" of agency action. *Native Ecosystems Council v. USFS,* 418 F.3d 953, 960 (9th Cir. 2005) ("We 'may not defer to an agency decision that is without a substantial basis in fact[.]'")  This in-depth review must occur to determine whether the agency's justification for its action is "supported by clearly identified substantial evidence whose import is explained."  *NW Coal. for Alternatives to Pesticides v. E.P.A.*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (citations omitted).  Courts thus act as a crucial corrective for irrational, unclear, or unsupported agency actions.  *Id.*  As explained herein and for the reasons in Plaintiffs' opening brief (Dkt # 18), such is the case here.

## II.    THE FOREST SERVICE VIOLATED NEPA

### A. An Environmental Impact Statement is Required

The USFS ignores that the threshold for its duty to prepare an EIS is a low one: an agency must prepare an EIS if its action "*may* have a significant impact upon the environment." *Nat'l Parks & Conservation Ass'n. v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001); *Klamath-Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006). This can be found by demonstrating that the agency failed to take a "hard look" at any one "significance factor," *Ocean Advocates v. Army Corps of Eng'rs*, 361 F.3d 1108, 1124-1125 (9th Cir. 2004), or a

combination of significance factors, *Blue Mtns. Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1212-14 (9th Cir. 1998); *Cascadia Wildlands v. USFS*, 937 F.Supp.2d 1271, 1284 (D. Or. 2013).

As Plaintiffs have argued, the CCR Project may significantly impact the environment based on a number of factors. Pl. Br. at 9-20. The USFS failed to carry its burden to demonstrate why these factors do **not** require an EIS. *See Blue Mtns.*, 161 F.3d at 1213 ("general statements about 'possible' effects and 'some risk' do not constitute a 'hard look'").

1. A Substantial Dispute About the Project's "Nature" and "Effects" Exists

A project is "controversial" within the meaning of 40 C.F.R. §1508.27(b)(4), when *evidence* casts serious doubt upon the reasonableness of the agency's conclusions or upon the size, nature, or effect of the project. *Nat'l Parks*, 241 F.3d at 736.  Defendants correctly note an action is not "controversial" merely because someone opposes it.  Defendants are wrong, though, in contending Plaintiffs offer nothing but general opposition to all "active forest management."

> a. *Mischaracterizing the commercial logging of large trees, mature and old-growth forests as "restorative" and claiming it will reduce the risk of a high-severity wildfire is highly controversial and dubious from a scientific perspective.*

An agency's failure to "discuss and consider" evidence contrary to the agency's position in its NEPA analysis suggests that the agency "did not take the requisite 'hard look' at the environmental consequences" of the proposed action. *Blue Mtns.,* 161 F.3d at 1213 (USFS failed to disclose independent report's findings in its EA that there "is no ecological need for immediate intervention in post-fire landscapes."); *Sierra Club v. Bosworth,* 199 F.Supp.2d 971, 979-80 (N.D. Cal. 2002) (USFS violated NEPA by failing to disclose the lack of scientific support for its belief that logging would reduce the intensity of future wildfires, and failing to address contradictory science).  Plaintiffs provided numerous scientific studies casting serious doubt on the reasonableness of the agency's contention that logging large trees and mature and

old-growth forests is restorative and will reduce the risk of "uncharacteristically" severe wildfire. Pl. Br. at 10-13. Despite Intervenor's assertion, the USFS never referenced, let alone meaningfully addressed, any of this research. Int. Br. at 11(Dkt # 30) (stating "the USFS considered and appropriately rejected plaintiffs' independent science…").

Not finding any support in the DN/FONSI, Intervenor points to the agency's response to Plaintiffs' objection, AR20291. There, the USFS simply pointed back to generalized statements in the EA, including the agency's anecdotal observation of two fires in dry plant communities that remained small in areas that had been recently thinned and underburned. AR20848. There is no analysis as to how that example meaningfully compares to logging in moist, mature and old-growth forests in FRCC1 (only minimally departed from historical conditions). This is a far cry from taking a "hard look" and explaining why the abundance of scientific literature in the record that specifically questions logging late-successional forests, removing large trees, and reducing canopy cover to purportedly reduce future fire risk and severity, does not evidence a serious scientific dispute for purposes of NEPA's EIS factor. 40 C.F.R. § 1508.27(b)(4).[2]

The USFS's brief ignores this large body of contrary science, while Intervenor attempts to discredit two (of many) references as not "peer-reviewed." Int. Br. at 9. Intervenor's claim lacks merit. First, both cited papers synthesize numerous peer-reviewed studies, many of which

---

[2] Intervenor mistakenly relies on *Earth Island Instit. v. USFS.* 697 F.3d 1010, 1021 (9th Cir. 2012). Int. Br. at 9. That case did not address "scientific controversy" for determining whether an EIS was required, but rather whether the USFS adequately responded to "responsible opposing view[s]" as required by 40 C.F.R. § 1502.9(b), which the Court held does not apply to EAs, only EISs. *Id.* Moreover, the Court held the agency did in fact discuss the specific findings of a scientific study presented during the public comment period, which is not the case here. *Id.* Federal-Defendant's reliance on *Hapner v. Tidwell* is also unavailing as the Ninth Circuit plainly stated it did not address whether a "scientific controversy" requiring an EIS existed. *See* 621 F.3d 1239, 1244-45 (9th Cir. 2010) ("This case is different from those in which courts have identified significant controversies as to the efficacy of the Service's proposed methods.")

were prepared by the same experts that authored the syntheses.  *See* AR19303-07, 20138-59.

Second, those two papers are just the tip of the melting iceberg when it comes to the research

cited throughout the record that is highly critical of logging large trees, aggressively thinning

older forests, and reducing canopy cover in the name of fuels reduction and forest resiliency.  *See*

AR17441-52, 19269-329, 19371-83, 19390-99, 20139-59, Ex. A, pp. 56-57 (Dkt # 18-1).

The crux of the USFS's rebuttal, on the other hand, seems to be that the CCR Project

cannot be deemed highly controversial within the meaning of NEPA because it employs well-

established "variable density thinning" (VDT) prescriptions.  USFS Br. at 14-17 (Dkt # 29-1).

Defendants suggest VDT is synonymous with "thinning from below" to remove small understory

and "unhealthy" trees, while leaving most of the large "vigorous" ones.  USFS Br. at 6-7, 14-16.

But nothing in the record establishes thinning from below as a requirement, and much evidence

points to a contrary conclusion.  For example, the agency's refusal to consider upper diameter

limits as Plaintiffs proposed, along with the projected large timber volume and the objectives to

significantly reduce trees per acre and canopy closure in stands up to 332 years of age, shows

that this Project does not contemplate just cutting small unhealthy trees.  Indeed, according to the

White River LSR assessment, it takes about 100 to 150 years to grow a 19 to 20-inch tree in this

area.  AR04855, 04861.  Thus, these older trees are **not** understory "ladder fuels," indeed, they

make up the forest canopy.  Reducing canopy cover in mature stands from 60 to 80% down to 35

to 50% (well below the level needed for old forest dependent species), as planned, requires that a

substantial number of old, overstory trees **must** be cut.  AR21097-122.  Suggesting that VDT

translates to "thinning from below" is an example of Defendants misrepresenting the highly

contentious aspects of the CCR Project.  *Id.*   Unfortunately, the CCR Project coupled common-

sense and scientifically sound management objectives (i.e. thinning small understory trees,

reducing ladder fuels) in forests outside their historic fire regime with aggressive commercial logging in healthy mature forests in order to meet high volume timber targets – thus creating scientific controversy.  Pl. Br. at 2.

Furthermore, the CCR Project is unlike Defendants' cited cases that challenged hazardous fuel reduction projects planned under the Healthy Forests Restoration Act ("HFRA"). *See Conservation Cong. v. USFS* ("*Smokey Project*"), 235 F.Supp.3d 1189 (E.D. Cal. 2017); *Conservation Cong. v. USFS* ("*Lava Project*"), 2018 WL 2427640 (E.D. Cal. May 29, 2018). The Smokey Project was planned in forests classified as "Fire Regime Condition Class 3", indicating a severe departure from historic conditions and significant chance for the loss of species or habitats. 235 F.Supp.3d at 1200.  The Lava Project similarly sought to address forests stricken by drought-induced tree mortality.  2018 WL 2427640, *3.  These conditions contrast with the healthy late-successional forests at issue here.  In fact, the USFS recognized its goal of timber production prevented it from planning the CCR Project under the HFRA.  AR21017. Defendant also repeatedly suggests the CCR Project will focus on removing "unhealthy" trees, but the fact that a serious deficit in snags exists throughout the Project area (*Infra Sec. III.B*) shows these are not forests with high mortality levels.[3]  As noted, most of the "non-plantation" units are in FRCC 1 (least departed from their natural range of variability).  Pl. Br. at 3 (AR20840).  Another critical distinction is that neither case appears to have hinged on logging mature or old-growth stands—neither the Smokey or Lava project removed or downgraded suitable spotted owl habitat.  *See* 235 F.Supp.3d at 1208 ("No loss of NSO habitat is expected …degradation is expected to be short-term, returning to normal after two to three years."); 2018

---

[3] Notwithstanding the fact that dead trees (snags and down logs) are a critical component to *healthy*, complex older forests.  *See e.g.* AR18279-80, 17547.

WL 2427640, *4-5 (project would not result in the loss/downgrading of any suitable spotted owl

habitat and all but 6 acres of dispersal habitat would be maintained).

Defendants also miss the point of this district's holding in *Or. Wild v. BLM*: harvesting

mature forest in northern spotted owl (NSO) critical habitat as an alleged form of "ecological

restoration" is highly controversial for purposes of NEPA's significance factors.  2015 WL

1190131, *1-2, 7-9 (D. Or. March 14, 2015).  The distinction between logging prescriptions –

"variable retention harvest" there and "variable density thinning" here – is not dispositive.  USFS

Br. at 15-16.[4]   As the *Or. Wild* court explained, the controversy turned on the fact that the BLM

proposed applying that aggressive logging method to mature forests within suitable NSO habitat,

without record support for claiming it was restorative and would benefit the owl in the long-term.

*Id*. at *2, 7-9.  The instant case is directly analogous.  Further, while applying variable retention

logging to stands over 80 years of age represented a shift in the BLM's management practices

which had largely relied on thinning younger stands, *Id*. at *2, 9, so too does the CCR Project for

MHNF.  Variable density thinning can range from light to aggressive, removing trees of "**all**

**sizes**" not just small or "unhealthy" ones.  AR18685.  Here the USFS has proposed the largest

commercial timber sale in MHNF in over a decade with the expectation it will generate roughly

double the entire National Forest's annual timber volume by reviving logging in mature and old-

growth forests.  Pl. Br. at 1-3.  An EIS is necessary.

//

---

[4] In *Or. Wild*, BLM "would apply variable retention harvesting techniques to 265 acres, retaining 78 acres and logging 187 acres of forest" wherein "160 acres of mature forest (over 80 years of age) would be cut." *Id*. at *2.  Regeneration harvests with variable retention were not a new silvicultural method as they are allowed on Matrix lands under the NWFP.  In fact, BLM proposed retaining more trees under their variable retention model for the White Castle project (approximately 29%) than the minimum required under the NWFP (15%).  *See* AR04175.

*b. Alleging the spotted owl will benefit from commercially logging older forests in designated critical habitat is highly controversial and scientifically uncertain.*

The impacts of logging high-value NSO critical habitat are highly controversial, as is the USFS's claim that it will benefit the species in the long-term, thus obviating the need for an EIS. Pl. Br. at 14-16; *Or. Wild*, 2015 WL 1190131, *7-9; *Klamath-Siskiyou Wildlands Ctr. v. USFS*, 373 F.Supp.2d 1069, 1086 (E.D. Ca. 2004) ("Neither the net long term benefits of the program, nor the risk associated with not implementing the project, relieve the [USFS] of its duty to conduct an EIS...."). As Plaintiffs' opening brief and the court in *Or. Wild* explain, the owl's Recovery Plan encourages active management in younger, overstocked stands and plantations, particularly in dry forest sites, but not in older moist forests and already functioning high-quality owl habitat. Pl. Br. at 14-16; *Or. Wild*, 2015 WL 1190131, *7-9; Ex. A, pp. 56-57 ("Silvicultural treatments are generally not needed to maintain existing old-growth forests on moist sites. [] Efforts to alter either fuel loading or potential fire behavior in these sites could have undesirable ecological consequences."); 77 Fed. Reg. 71876, 71881-82 (Dec. 4, 2012) (Critical Habitat Final Rule) ("[A]ctive forest management within such areas [of critical habitat] could negatively impact [NSOs]. We are not encouraging land managers to consider active management in areas of high-quality owl habitat"…"Focus active management in younger forest, lower quality owl habitat, or where ecological conditions are most departed from the natural or desired range of variability.") NSOs indisputably require moderate to high levels of canopy closure (i.e. 60 to 90%). Ex. A, pp. 106, 125. Studies further show that, with adequate canopy cover (i.e. greater than 60%) and a large tree component, spotted owls will roost in burned forests "*regardless of burn severity*." Ex. A, p. 69 (emphasis added). Yet the CCR Project would log hundreds of acres of forest that is currently suitable habitat and render them unsuitable for the owl's essential life functions of nesting and roosting. *See* AR21102-03, 21118-19, 21121-22.

Attempting to sweep these inconvenient truths under the rug by referring to this entire

action as a restoration project is, at minimum, highly controversial.  Indeed, Intervenor repeats

the FWS's mischaracterization from its exceptionally cursory Biological Opinion, that "the CCR

Project 'is a dry forest restoration treatment'" – clearly an inaccurate overgeneralization. Int. Br.

at 12 (citing "BiOp" at AR18400); AR20792, 21071 (showing thinning will occur on 5,646 acres

of *moist* forests, nearly half of all logging units).  In sum, the agency's DN/FONSI, AR21077-79,

failed to supply "a convincing statement of reasons to explain why it concluded the project's

impacts were insignificant and did not prepare an EIS." *Or. Wild*, 2015 WL 1190131, *11.

    2.   <u>Plaintiffs Raised Substantial Questions as to Whether the CCR Project May
Significantly Impact NSO Critical Habitat</u>

NSO populations continue to decline on a range-wide basis despite conservation efforts

under the NWFP and its system of late-successional reserves (LSRs), due, in part, to the

continued logging of critical habitat.  Pl. Br. at 4-5; *Or. Wild*, 2015 WL 1190131, *1.  The

species' chance for recovery has also been compromised by the growing barred owl threat.  *Id*.,

Pl. Br. at 17-18.  As FWS recently determined, uplisting the NSO to endangered status may be

warranted.  AR18273.  Consequently, as the Recovery Plan emphasizes, it is vital to conserve as

much older forest as possible, regardless of where it occurs in the NWFP's system of land

allocations (i.e. including Matrix lands). Ex. A, pp. 37-38, 56

According to the USFS's Biological Assessment ("BA"), "if the Proposed Action

maintains the [Physical or Biological Features ('PBFs")] in a manner that meets the life history

needs of the spotted owl at the stand scale, then it would *not have significant adverse impacts* at

the subunit scale." AR18201 (emphasis added). The USFS determined that "[b]ecause PBF 4

[dispersal] would be removed on 895 acres, and PBFs 2 and 3 [nesting and roosting] would be

downgraded on 1,059 acres, these treatment units would no longer provide or would reduce the

quality of PBFs for reproduction and survival of the spotted owl" at the stand scale. *Id.* In other words, by the agency's own measure of "significance," the fact that the CCR Project results in the owl's life history needs no longer being met at the stand scale runs counter to the USFS's FONSI. AR21078-79.

Defendants' responses are contradictory and misstate law and facts. For instance, Federal-Defendant suggests it is wrong for the Court to consider the USFS's "likely to adversely affect" finding from the BA, because that determination was made pursuant to the agency's obligations under the ESA and not NEPA. USFS Br. at 18. Yet Defendants repeatedly point to the FWS's no "jeopardy" or "adverse modification of critical habitat" determinations under the ESA in downplaying the potential significance of the Project's impacts. USFS Br. at 1, 8, 13, 18-22.[5] The true distinction here is between NEPA's notably "low standard" for finding "significance" triggering the duty to prepare an EIS and the nearly unattainable thresholds the FWS uses for finding "jeopardy" or "adverse modification" of critical habitat under the ESA.

NEPA requires federal agencies to evaluate site-specific projects at all relevant scales, including within a local and cumulative context—rather than diluting the impacts of a single project to a species or its critical habitat across tens of thousands or even millions of acres. 40 C.F.R. § 1509.27(a) (significance depends upon "the effects in the locale."); *Anderson v. Evans*, 314 F.3d 1006, 1018-19 (9th Cir. 2002) (EIS required where impacts from tribe's whale hunting may be significant to the whale population "in the local area.") In contrast, ESA jeopardy determinations are based on the effects of the proposed action on the continued existence of a

---

[5] Both Defendants' briefs erroneously state that the CCR Project will not adversely affect the spotted owl's critical habitat. USFS Br. at 1; Int. Br. at 13. The USFS's BA plainly found the CCR Project was "likely to adversely affect" the owl's critical habitat due to the loss of 895 acres of dispersal habitat, the downgrading of 1,059 acres of NRF habitat, and likely adverse effects to the owl's prey. AR18201-02.

species as a whole (i.e. across its entire range). AR18392. Similarly, "adverse modification to

critical habitat" determinations are based upon the direct and cumulative impact of the project to

the value of the critical habitat "rangewide." AR18392-93.[6] Thus, because ESA determinations

assess impacts at expansive geographic scales, such as a species' entire range (in this case 9.5

million acres), and *not* at the local level, BiOps resulting in "jeopardy" or "adverse modification"

conclusions are nearly non-existent.[7]  USFS at 19 (citing AR18169). Consequently, as further

explained in the law review article cited *infra*, the extraordinarily high standards FWS has for

making "jeopardy" and "adverse modification" determinations could potentially allow species

like the NSO to be driven to extinction, quite literally, by death from a thousand cuts.  *See also*

*Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036-37

(9th Cir. 2001) (using a large spatial scale to dilute the actual localized and aggregated impacts

of individual projects is also arbitrary and capricious).

Plaintiffs do not argue that finding significance under 40 C.F.R. 1508.27(b) turns on

impacts to individual members of a listed species, as Defendants contend, but rather how the

Project, individually and cumulatively, impacts the species or its critical habitat in the local area.

USFS Br. at 18; Int. Br. at 13.  As several courts have recognized, adverse impacts, short of

---

[6] The CCR Project area is about 24,010 acres, consisting of 12,072 acres proposed logging units plus a 0.5 mile radius around the proposed units.  AR18390, 18151. Defendant asserts that there are 19,050 acres of owl habitat in the project area relying on the Biological Assessment, which evaluates a Project area of 36,343 acres. Fed. Def at 19, *see also* AR18172.

[7] *See e.g.* Dave Owen, *Critical Habitat and The Challenge Of Regulating Small Harms*, 64 Fla. L. Rev. 141, 165 (2012). Available at: http://scholarship.law.ufl.edu/flr/vol64/iss1/5 (Showing less than 1% of all BiOps  sampled between 2005 and 2009 resulted in a finding of "jeopardy" or "adverse modification" of critical habitat); Malcolm and Li, *Data contradict common perceptions about a controversial provision of the US Endangered Species Act* (2015) Available at: www.pnas.org/cgi/doi/10.1073/pnas.1516938112 (Of all BiOps recorded by FWS from 2008 to April 2015 (totaling 6,829), only 2 (less than !%) resulted in a jeopardy determination, one of which also resulted in an "adverse modification of critical habitat" determination).

jeopardizing the entire species' survival or recovery, can certainly be "significant" under 40

C.F.R. 1508.27(b). *Or. Wild*, 2015 WL 1190131, *10; *Cascadia Wildlands v. Forest Serv*., 937

F. Supp.2d 1271, 1282 (D. Or. 2012); *Klamath-Siskiyou Wildlands Ctr.*, 373 F.Supp.2d at 1080;

*Makua v. Rumsfeld*, 163 F. Supp.2d 1202, 1218 (D. Haw. 2001) ("A FONSI…must be based on

a review of the potential for significant impact, including impact short of extinction. Clearly,

there can be a significant impact on a species even if its existence is not jeopardized.").

Defendants rely on inapposite cases. USFS Br. at 18-19; Int. Br. at 13. In *EPIC*, the Ninth

Circuit held the USFS reasonably determined the project would not significantly affect the NSO

where "only fourteen acres of nesting habitat would actually be removed" and "fifty-one acres of

'high' quality nesting habitat would be degraded to 'moderate' quality." *EPIC v. USFS,* 451 F.3d

1005, 1010 (9th Cir. 2006). As discussed *supra*, *no* loss of owl habitat was expected with the

"Smokey Project" and any minimal degradation was expected to return to normal in just two to

three years. *Conservation Cong.*, 235 F.Supp.3d at 1208. Last, *Native Ecosystems Council v.*

*USFS.*, 428 F.3d 1233, 1240-41 (9th Cir. 2005), did not involve listed species or critical habitat.

Intervenor also misstates the holding in *Or. Wild v. BLM*, which did *not* involve the

"incidental take" of any spotted owls as a factor weighing in favor of an EIS.[8] Int. Br. at 15-16;

*Or. Wild*, 2015 WL 1190131, *10, fn. 13.  In fact, the court rejected the very same flawed

attempt from Intervenor to distinguish that case from *Cascadia Wildlands*, 937 F. Supp.2d at

1282 and *Klamath-Siskiyou Wildlands Ctr.*, 373 F. Supp. 2d at 1080, on the basis of "incidental

take," which Intervenor once again advances here.  *See*. *id.* at *10, fn. 13; Int. Br. at 15-16.  The

cases relied on by Plaintiffs instead focus heavily, though not exclusively, on adverse impacts to

---

[8] "Incidental take" is a legal term of art under the ESA referring to actions expected to result in
the death or injury of individual members of a federally listed species, *see* AR18400-01.

the NSO's critical habitat, and here the CCR Project would remove, downgrade and degrade much more critical habitat than any of those prior cases. *See* Pl. Br. at 18.

Finally, Defendants express confusion as to how this Project relates to the increasing barred owl threat, which further demonstrates the USFS's failure to take a hard look at the issue of exacerbating interspecies competition. Pl. Br. at 17-18 (discussing issue); USFS Br. at 22, fn. 13 (expressing confusion and notably not citing to the EA to explain how the potential to increase interspecies competition factors into its FONSI). Intervenor further obfuscates the issue by addressing a straw-man rather than the actual argument raised by Plaintiffs, which, again, is: the CCR Project reduces the amount of suitable NSO habitat in an already degraded critical habitat subunit where barred owls are known to be present, but the EA fails to take a hard look at the impact on interspecies competition. Pl. Br. at 17-18; Int. Br. at 15 (instead addressing whether thinning will "expand the range of barred owls"). As the BA shows, the best available science indicates this Project is likely to exacerbate the problem of competitive pressure. AR18167-68. The USFS never explains why, when such an effect is so likely, it does not add to the significance of the Project's combined effects (i.e. direct, indirect, and cumulative).

3.  The Potential for a Cumulatively Significant Impact Exists

Intervenor tries to improperly shift the burden to Plaintiffs to demonstrate how the effects of other recent and soon to be logged timber sales within the same critical habitat subunit as the CCR Project area "were so significant that the preparation of an EIS is necessary." Int. Br. at 17. Plaintiffs need only raise substantial questions as to whether a potentially significant cumulative impact *may* occur. *Klamath-Siskiyou Wildlands Ctr.,* 468 F.3d at 562. For the reasons set forth in their opening brief and *infra*, Plaintiffs have met that "low standard." *Id*.; Pl. Br. at 18-19, 20-22; *Infra Sec. II.B.1 & 2.* It is the USFS's burden to then provide a convincing statement of

reasons as to why these combined effects are insignificant.  *See Blue Mtns.*, 161 F.3d at 1212.

The agency failed to carry that burden here.  *See* AR21078 (FONSI); 20830, 20907 (EA).

    4.  <u>The CCR Project Adversely Affects Ecologically Critical Areas</u>

Defendants' briefs ignore that the EA and DN/FONSI entirely failed to consider proposed

logging in the White River LSR as a potential significance finding factor.  Plaintiffs do not argue

that the "mere presence" of the White River LSR triggers this need; rather, it is the degree of

impact from logging 440 acres of the White River LSR and, specifically, decreasing canopy

cover in many LSR stands below levels required to support the essential life functions of old

forest dependent species like the spotted owl (i.e. the primary purpose for which LSRs were

designated).  *Infra Sec. III.A.*  Defendants' narrative about the CCR Project largely focusing on

the removal of small, understory trees is contradicted by the record.  *Supra II.A.1* (trees beyond

80 years of age or over 18" dbh are *not* young, understory trees that contribute to ladder fuels).

In short, the USFS cannot simply assert that adverse impacts to the White River LSR will

be minor and negated by the alleged benefit of saving these forests from a "stand-replacing

disturbance event." USFS Br. at 24. Conclusory assertions are not actual evidence or analysis,

and simply saying something is so does not make it so – especially when widely contradicted by

the literature. But even if there *was* scientific support for the agency's assertion that logging

large, older trees from late-successional stands reduces the risk of a "stand-replacing" fire:

"[n]either the net long term benefits of the program, nor the risk associated with not

implementing the project, relieve the USFS of its duty to conduct an EIS when the project will

have significant environmental impacts."  *Klamath-Siskiyou,* 373 F.Supp.2d at 1086.

Plaintiffs raised substantial questions as to whether adverse effects to the White River

LSR may be significant.  *See also* Pl. Br. at 19-20, 28-30, *Infra Sec*. *III.A*; *Cascadia Wildlands*,

937 F.Supp.2d at 1281-84; *Klamath-Siskiyou Wildlands Ctr. v. Grantham,* No. 2:18-cv-02785-

TLN-DMC, slip copy at 1-13 (E.D. Cal. Jan. 25, 2019) (plaintiffs "raised substantial questions

about the environmental impacts of the Project such that an EIS might have been required"

where the USFS proposed salvage logging activities within an LSR and spotted owl habitat).

    5. <u>The CCR Project Violates Other Legal Requirements</u>

    For the reasons presented in Plaintiffs' opening brief and below, the USFS's violations of

NFMA and the TMR further demonstrate the need for an EIS.  40 C.F.R. § 1508.27(b)(10); *see*

Pl. Br. at 28-35; *Infra Sec. III & IV.*

**B.  Failure to Take the Requisite 'Hard Look' at Other Key Concerns**

    Key to fulfilling NEPA's "hard look" requirement is the mutual sharing of high-quality

information between the public and the action agency. As the Ninth Circuit noted, "[i]nformed

public participation in reviewing environmental impacts is essential to the proper functioning of

NEPA."  *League of Wilderness Defenders/Blue Mtns. Biodiversity Project v. Connaughton*

*("LOWD")*, 752 F.3d 755, 761 (9th Cir. 2014). NEPA ensures that the public can *both* contribute

information to the agency *and* access information that the agency collected.  Complying with

NEPA should not mean jumping through a series of procedural hoops; rather, it is essential that a

federal agency actually engage with the information and concerns presented by the public and

that its final decision reflects this.  *See e.g. Or. Natural Desert Ass'n v. BLM*, 625 F3d 1092,

1099-1100 (9th Cir. 2010) ("NEPA relies upon democratic processes to ensure … that 'the most

intelligent, optimally beneficial decision will ultimately be made.'").  Consistent with the

principle of democratic decision-making, Plaintiffs provided the USFS very detailed, site-

specific information gleaned from the thousands of hours their members spent ground-truthing

the CCR Project area.  This data was gathered to help the USFS make a fully informed

assessment of the Project's impacts and well-reasoned decision.  Unfortunately, the USFS did

not incorporate extensive stakeholder input, seemingly trying to do the minimum analysis

possible to meet their pre-determined outcome (i.e. timber volume target).  *See W. Watersheds*

*Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011) ("The 'hard look' must be taken

objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge

designed to rationalize a decision already made.") (citation omitted).

     1.   <u>Inadequate Cumulative Impacts Analysis</u>

In NEPA comments, Plaintiffs requested the USFS provide the date, size, acreage, road

mileage, and beneficial or adverse impacts of each project included on the list of projects with

potentially cumulative impacts.  AR17521-22.  This was requested not because, as Defendants

misconstrue, NEPA requires this <u>specific</u> information, but because NEPA requires a "sufficiently

detailed catalogue of past, present, and future projects, and . . . adequate analysis about how

these projects, and differences between the projects, are thought to have impacted the

environment."  *Te-Moak Tribe of W. Shoshone v. Dept. of Interior*, 608 F.3d 592, 603 (9th Cir.

2010), *see also Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989. 992 (9th Cir. 2004) (a

cumulative impacts analysis "must be more than perfunctory; it must provide a useful analysis of

the cumulative impacts of past, present, and future projects.")  The information requested

provides useful context for adequately assessing the cumulative impacts of these listed projects

when combined with the impacts of the CCR Project.  Defendants assert that the EA did assess

the potential cumulative impacts of these listed projects on thirteen different Forest resources,

but their brief cites only the list itself and the EA's assertion that "[e]ach of the analyses

conducts cumulative effects analysis resulting from this project."  USFS Br. at 25 (citing

AR20829-30).  Importantly, Defendant does not direct the court to *any cite* in the record where

the USFS provided a useful analysis of these projects' impacts when combined with those of the CCR Project, on any resource.

The little "analysis" of cumulative impacts in the EA is mainly premised on the myth that the CCR Project has no direct impacts and thus no cumulative impacts.  For example, the fuels analysis states: "[t]he analysis of cumulative effects considered the list of past, present and reasonably foreseeable activities in Table 11. . . There are no negative effects to fuels from the Proposed Action treatments, therefore there are no cumulative effects."  AR20849.  This conclusory statement ignores extensive information in the record about direct adverse impacts to fuel loads from logging, (*see* Pl. Br. at 10-13), while also not providing any useful analysis about the impact of other timber sales affecting this area, such as the large slash piles left from the N. Fork Mill Creek or Bear Springs timber sales.  *See e.g.* AR17545-46 (including photo). Similarly, when assessing the cumulative impacts to vegetation, the EA states:

> Only the vegetation-related proposed projects that overlap with this project area that also have direct or indirect effects are included in the cumulative effects analysis…there are no direct or indirect effects that would cumulate from other projects due to the minimal amount of connectivity with past treatments regarding plant communities. The total cumulative effects at the landscape scale for this project would be very nominal, and no cumulative effects are expected as a result of the proposed projects to the vegetation resource.

AR20838.  This is a string of conclusory sentences not supported by any useful information, much like the vague conclusion about impacts to NSOs: cumulative actions "have reduced the amount of suitable habitat on the landscape" and "will continue to do so into the future." AR16331, 20907. Generalized, conclusory assertions from agency experts are insufficient—the agency must provide the underlying data supporting its assertion in language intelligible to the public. *Klamath Siskiyou*, 387 F.3d at 996.

//

2.  <u>The USFS Improperly Limited the Scope of Its Cumulative Impacts Analysis for the NSO and its Critical Habitat.</u>

The USFS's cumulative impacts analysis also is deficient because it failed to define the proper geographic scope with regards to the NSO and its critical habitat.  Pl. Br. at 21-22. Defendants are correct in that determining the geographic scope "is a task assigned to the special competency of the appropriate agencies."  *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976). Still, "the choice of analysis scale must represent a reasoned decision and cannot be arbitrary." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).  Defendants' arguments misunderstand the purpose of analyzing cumulative impacts: to determine whether incremental direct effects combine with other effects to create a significant impact on a larger scale.  *Klamath-Siskiyou*, 387 F.3d at 993-96.  If the USFS improperly restricts its cumulative impacts analysis, it "would be easy to underestimate the cumulative impacts of the timber sales, and of other reasonably foreseeable future actions…Such a restricted analysis would impermissibly subject the decisionmaking process contemplated by NEPA to 'the tyranny of small decisions.'"  *Kern v. BLM*, 284 F.3d 1062, 1075-78 (9th Cir. 2002) (citation omitted).

The CEQ recognized that "the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individually minor effects of multiple actions over time," and issued guidance documents on necessary cumulative effects analyses.  CEQ, *Considering Cumulative Effects Under the [NEPA]*, at 1 (Jan. 1997) ("*Considering Cumulative Effects*").[9]  For example, "[f]or a project-specific analysis, it is often sufficient to analyze effects within the immediate area of the proposed action[,] [w]hen analyzing

---

[9] http://energy.gov/sites/prod/files/nepapub/nepa_documents/RedDont/G-CEQ-ConsidCumulEffects.pdf.  Though the CEQ guidance documents are not necessarily binding, several courts have cited to them as a consideration in their decision. *See LOWD,* 2014 WL 6977611, at *7 (D. Or. Dec. 9, 2014); *Kern*, 294 F.3d at 1078.

the contribution of this proposed action to cumulative effects…the geographic scope boundaries

of the analysis almost always should be expanded." *Considering Cumulative Effects*, at 12. The

CEQ suggests a process for determining the geographic area of a cumulative impacts analysis:

> • Determine the area that will be affected by the action. That area is the
> project impact zone.
> • Make a list of the resources within that zone that could be affected by the
> proposed action.
> • Determine the geographic areas occupied by those resources outside of the
> project impact zone. In most cases, the largest of these areas will be the
> appropriate area for the analysis of cumulative effects.

*Id.*, at 15. Here, the largest relevant scale for assessing cumulative impacts to NSO critical

habitat, would likely be the critical habitat subunit that envelops the CCR Project area. *See*

AR16334-38. Yet, the USFS only assessed cumulative effects to critical habitat at the scale of

the Project boundary and its eight overlapping NSO territories. AR16335, 16324 (map); USFS

Br. at 26.[10] The USFS offers no explanation or justification for that geographic limitation.

The Ninth Circuit and district courts have, time and again, rejected NEPA analyses that

limit the geographic scope of the cumulative impacts analysis to a small area and fail to account

for other timber sales outside that restricted area on the resources being managed. In *LOWD*, the

court held that the USFS violated NEPA by failing to provide an adequate explanation for

limiting the scope of its cumulative impacts analysis for two old-growth dependent species to the

local watershed (123,377 acres in size), rather than the geographic scale of the National Forest at

---

[10] Defendant also erroneously suggests that the BA "assessed potential effects of the Project
across the critical habitat subunit and beyond." USFS Br. at 26 (citing AR18204-05, 18209).
But those cited pages only discuss the direct effects of the CCR Project at the subunit scale, not
the combined effects of the CCR Project and the other timber sales that were excluded from the
agency's cumulative impacts analysis because they were outside the delineated "analysis area."
Moreover, the BA and BiOp further indicate that the USFS's cumulative effects analysis for
purposes of its ESA consultation for the NSO was limited to the "action area"—the Crystal Clear
treatment units plus lands within 0.5 miles of the unit boundaries. AR18151, 18209, 18392.

issue.  2014 WL 6977611, at *9-11; *See also Native Ecosystems Council v. Dombeck*, 304 F.3d

886, 902 (9th Cir. 2002) (An agency must provide support for its choice of analysis area and

must show that it considered the relevant factors).  *Kern,* 284 F.3d at 1078-79 (rejecting EA that

failed to consider cumulative impacts of other timber sales on BLM's Coos Bay District on the

Port Orford cedar that were outside the delineated "analysis area"); *Rittenhouse*, 305 F.3d at 973-

74 (use of "home range" as scale for cumulative effect analyses for old-growth indicator species

was arbitrary); *City of Tenakee Springs v. Clough,* 915 F.2d 1308, 1313 (9th Cir.1990) (enjoining

logging where the USFS failed to analyze the cumulative impacts of a proposed timber sale

together with four other proposed sales throughout the same National Forest).

     The record here is similarly devoid of an explanation as to why the agency chose to limit

its cumulative effects analysis for the NSO and its critical habitat to an even smaller scale and

exclude from its analysis the impacts of other MHNF timber sales affecting the same critical

habitat subunit.  Defendants improperly insist impacts to the NSO's critical habitat will be

insignificant because the CCR Project will only adversely affect a small percentage (2.4%) of the

overall 139,983-acre subunit.  USFS Br. at 19, 22.  But the USFS *never assessed* that impact in

combination with other recent and proposed timber sales, such as the four timber sales Plaintiffs

raised in their comments.  Pl. Br. at 22.  As noted, these four other sales collectively degrade an

additional 2,899 acres of NSO critical habitat in this same subunit.  *Id.*  And all unoccupied and

likely occupied areas are **essential** for the conservation of the species to meet the recovery

criterion.  77 Fed. Reg. 71876 (Dec. 4, 2012).

     Last, Defendants' briefs refer to the legally approved practice of aggregating cumulative

effects but there is no indication that the USFS prepared an aggregated cumulative effects

analysis that included the relevant past timber sale inputs.  The agency's failure to take these

activities into consideration when analyzing the cumulative impacts to the NSO and its critical habitat is arbitrary and capricious.

    3.  <u>Failure to Establish an Accurate Environmental Baseline</u>

Defendants' responses highlight the inaccuracy of the USFS's environmental baseline for the CCR Project by continuing to mischaracterize the entire Project area as "overstocked" and overly "dense." *See e.g.* Int. Br. at 1 ("current stand conditions of the CCR Project area…are overstocked and dense,"), USFS Br. at 4 ("[h]ighly dense and homogeneous stand conditions throughout much of the planning area.")  Again, creating an artificial environmental baseline for the CCR Project by painting this diverse Project area with such a broad brush makes it impossible for both the agency and the public to accurately measure and evaluate the environmental impacts of the proposed action. *Ctr. for Biol. Diversity v. BLM,* 422 F.Supp.2d 1115, 1163 (N.D. Cal. 2006); 40 C.F.R. § 1500.1(b).

Defendants assert that the USFS staff collected robust baseline data, and that Plaintiffs' claim is essentially a disagreement about stand conditions.  USFS Br. at 34.  Plaintiffs do not dispute that the USFS collected stand data.  Rather, Plaintiffs argue that such data does not support the agency's sweeping generalizations, and was incompletely and/or misleadingly presented in the NEPA documents.  For example, the USFS compiled a detailed chart that shows a great diversity (rather than homogeneity) of forest type, age, management history, and more across the Project area.  AR21097-122.  Unfortunately, this chart is incomplete, leaving the stand age blank for **69 units**.  *Id.*  It also contains information that appears incorrect; a single page of the chart highlights a number of factual inconsistencies, including: a 268 year-old "sapling thin", a 258 year-old non-plantation listed as having 5,491 trees per acre, a 120 year-old "commercial plantation," and four units of "non-plantation" with no age, but each with exactly 2,137 trees per

acre. *See* AR21118. Further, putting aside errors, it is impractical to expect most public stakeholders to review such a chart in detail; the narrative descriptions in the EA and DN/FONSI should accurately represent the data contained therein, but do not.

As another example: high tree density is touted as the key condition of forest stands justifying logging, but the chart does not include basal area (the measure of density).[11] AR21097-122. Basal area data is found in separate, much less detailed, tables which nonetheless support Plaintiffs' observation that many "non-plantation" stands already meet the desired density conditions as the existing basal area and desired basal area significantly overlap. *See* AR20794-97. With basal areas ranging widely across vegetation types from a low of 40 to a high of 283, this data does **not** support the characterization of the project area as uniformly dense and overstocked. *Id.* This was discussed extensively in Plaintiffs' opening brief, as their noted fieldwork found many stands that already contain what the USFS deemed "desired future conditions": widely spaced, large diameter trees, with a well-developed understory, either previously thinned or mature native forest that has not been actively managed displaying stand structure. Pl. Br. at 23 (citing AR17528-17530, 17527-28). Like the USFS's NEPA documents, Defendants' responses never address the disparity between Plaintiffs' fieldwork results and the agency's stand descriptions.

Instead, Defendants improperly characterize this as a "factual dispute" over stand conditions to which the court should defer to the USFS. Rather, much of the underlying USFS data is in accord with Plaintiffs' detailed, unit by unit findings: this area is diverse and heterogeneous with many stands already meeting desired future conditions. The discrepancy

---

[11] A density metric, basal area is the area of a breast-high cross section of a tree or of all the trees in a stand used to measure both the number and size of the trees in a given unit.

between the field data and the agency's narrative analysis in decision-making documents makes it impossible for the public to have a coherent, fact-based environmental baseline by which to evaluate the impacts of this Project. *ONDA v. Jewell,* 840 F.3d 562, 570 (9th Cir. 2016).

    4. Failure to take a Hard Look at Climate Change

Defendants suggest the "cut and pasted" analysis from the Polallie Cooper EA adequately analyzed climate change and carbon impacts of the CCR Project because "it is only reasonable that the climate change analyses would closely mirror each other." Int. at 21. The Polallie Cooper EA discussed impacts of thinning 2,830 acres in "the last untreated wildland urban interface (WUI) on the eastside of [MHNF]" including approximately 710 acres of mature forest.[12] Three times larger overall, the CCR Project contemplates logging **four times more** mature/old-growth forest—where most carbon is stored. AR17486. But, beyond the fact that the CCR Project is significantly larger than Polallie Cooper, and that copying a previous EA highlights the USFS's failure to meaningfully engage public comment, the very brief analysis does not provide a hard look at the relationship between this Project and climate change.

The Ninth Circuit established a rule in *Hapner v. Tidwell* that NEPA analyses must consider a project's "impact on global warming in proportion to its significance," 621 F.3d 1239, 1245 (9th Cir. 2010). In *Hapner*, the challenged project authorized logging on up to 810 acres in Montana's Gallatin National Forest, a "relatively small amount of land." 621 F.3d at 1245. Given its small size, and that the project's Decision Notice, "addressed comments regarding climate change", the Court found the climate change discussion adequate. *Id.* Similarly, in *LOWD v. Martin*, the court found the EA's analysis regarding the global climate impacts of

---

[12] The Polallie Cooper Project EA is available at:
https://www.fs.usda.gov/nfs/11558/www/nepa/92487_FSPLT3_4049010.pdf

thinning on 1,963 acres in the Umatilla National Forest in eastern Oregon adequate. 2011 WL 2493765 (D. OR, June 23, 2011). Neither court opinion indicates whether these smaller scale fuels reduction projects were in mature native forest, plantations, or both.

In contrast, the CCR Project proposes logging 11,742 acres, with almost 3,000 acres of mature and old-growth forest. Not only is the CCR Project significantly larger overall than the projects challenged in *Hapner* and *LOWD*, just the logging in mature and old-growth forest far exceeds their total size. Moreover, as extensively discussed in the record, it is increasingly clear that National Forests in the Cascade Range of Oregon play a uniquely important role in regulating the carbon cycle and sequestering carbon. *See* AR14389- 95, 17570-76, 17489-506. Because of the importance of mature Cascadian forests to the carbon cycle, local forest management decisions on MHNF have a disproportionately high impact on climate change. AR17575. A recent study found that decreasing logging on National Forests in the Pacific Northwest is one of the top land use strategies to mitigate climate change, concluding, "reforestation, afforestation, lengthened harvest cycles on private lands, and **restricting harvest on public lands** increased net ecosystem carbon balance by 56% by 2100, with the latter two actions contributing the most." AR19384 (emphasis added). Another study found emissions from commercial logging in moist forests make the forestry sector Oregon's #2 contributor to greenhouse gas emissions. AR17571. Not only does commercial logging directly cause significant carbon emissions, but also it decreases the forest's ability to store carbon for up to a decade. AR17575. In short, the impacts of logging the CCR Project both on emitting stored carbon and inhibiting the forest's future ability to sequester carbon, are much greater than those present in *Hapner* and *LOWD*.

Additionally, *Hapner* and *LOWD* were limited to discussing the impact of a proposed project on global warming; neither discussed the impacts of global warming on the affected area. A very recent California case discussed the government's failure to take a hard look at how a changing climate exacerbates the adverse impacts of the proposed project, finding that to meet the hard look requirement, "NEPA requires an evaluation of the impact of climate change." *AquAlliance v. U.S. Bureau of Reclamation*, 287 F.Supp.3d 969, 1028 (E.D. Cal. 2018). The court found that failure to consider climate change is a "failure to consider an important aspect of the problem" facing the proposed action. *Id.* at 1032, citing *Wild Fish Conservancy v. Irving*, 221 F.Supp.3d 1224, 1233 (E.D. Wa. 2016) (Biological Opinion was arbitrary and capricious for failing to adequately consider impacts of climate change). In the current case, the USFS similarly failed to recognize that mature forests are the most climate-resilient ecosystems and provide important habitat refugia for organisms stressed by a changing climate. AR14422, 17574. In this context, old-growth forests take on new significance, thus logging them has greater impact.

A NEPA analysis must discuss a project's "impact on global warming in proportion to its significance." *Hapner*, 621 F.3d at 1245. We are in a time of global climate crisis, in one of the most carbon-rich ecosystems in the world, discussing a Project that would log thousands of acres of old-growth trees for an industry that is one of the state's largest carbon polluters. Surely the climate impacts of the CCR Project require more than a brief, general analysis cut and pasted from a much smaller project. The record is replete with detailed, local information that USFS could have used to inform its analysis. By failing to engage this extensive body of science and failing to complete an analysis specific to the CCR Project, the USFS took no hard look.

//

///

### C. Failure to Consider Reasonable Alternatives

Defendants miss the point of the Ninth Circuit's decision in *W. Watersheds Project v. Abbey*: it confirmed that the evaluation of the validity of an agency's alternatives analysis *in an EA* hinges on whether the agency has evaluated all viable alternatives. 719 F.3d 1035, 1050 (9th Cir. 2013). When other feasible alternatives would meet the project's purpose and need, "[f]easible alternatives should be considered in detail." *Id*. at 1052. In disapproving the EA's rejection without detailed analysis of no-grazing and reduced grazing alternatives, the Court emphasized that these alternatives were feasible and would fulfill the purpose and need for the project. *Id*. Similarly, focusing the CCR Project on thinning saplings, commercial plantations and forests that have experienced a moderate to extreme departure from natural conditions (e.g. areas classified as FRCC 2 and 3) – *without* logging mature and old-growth forests that are currently suitable spotted owl habitat and/or largely within their natural range of variability (e.g. FRCC 1) – fits squarely within NEPA's definition of a reasonable, but unexamined alternative.

Defendants' responses fail to rebut this claim. Their briefs point to the USFS's explanation that it did not consider such an alternative in detail because "it did not provide any additional assurance that the spotted owl habitat would be retained on the landscape." USFS Br. at 30, Int. Br. at 23 (citing final EA at AR20825). This wholly irrational explanation both disregards research finding that "fuels reduction" logging results in far more owl habitat loss than do fires, AR19308-22, and seemingly rests on Plaintiffs' inability to prove the impossible – that there will never be a "stand-replacing" fire in these forests. Logical fallacies aside, the agency's own modeling results show there is a very low likelihood of an *active* crown fire in the CCR Project area. AR18642-43 (0% probability under moderate moisture scenario and 13% probability under low moisture scenario). Also, not all high-intensity fire is "uncharacteristic" of

these forests; many forest types within the White River watershed have been shaped by and

evolved with various frequencies of stand-replacing fire.  AR04783-87 (Watershed Assessment).

As further noted, the record science shows older forests and dependent species recover and

respond more favorably to wildfire, including high-severity burns, than to commercial logging

that substantially reduces canopy closure levels and removes large, older trees.  Pl. Br. at 10-16.

The USFS's additional explanation, that "this alternative would not meet the

recommendations of the Recovery Plan for land managers to actively restore forest ecological

structure and alter fire behavior and severity (USFWS 2011; p. III-20)," is directly contradicted

by the very record evidence upon which it claims to rely.  As the Court can see, those

recommendations refer to managing owl habitat in dry "fire-prone" forests, especially those that

are substantially departed from historical conditions.  Ex. A, pp. 59-61.  This is not the case for

*moist* older forests where the Plan advises against silvicultural treatments and "[e]fforts to alter

either fuel loading or potential fire behavior[.]" Ex. A, pp. 56-59; *Supra Sec*. *II.A*.  Accordingly,

"active management" in moist forests should focus on "younger or less diverse" areas outside of

older stands.  *Id*.  Simply put, "silvicultural treatments" beyond pre-commercially thinning small

ladder fuels in these moist forest areas is scientifically unsupported and conflicts with managing

for NSO recovery.  *Id*.  For these reasons, adopting an upper diameter limit of 18" dbh to avoid

logging larger, fire-resilient trees also constitutes a reasonable, but unexamined alternative.

Thus, the USFS's decision to authorize logging on 2,970 acres of mature and old-growth

forests in NSO critical habitat, including at least 750 acres of *moist* older forests, without first

examining, in detail, these reasonable alternatives, and by failing to offer valid reasons for

rejecting such alternatives, is arbitrary and capricious in violation of NEPA. *Abbey*, 719 F.3d at

1050-53; *Or. Wild v. BLM*, 2015 WL 1190131, *4-6.[13]

## III.  THE FOREST SERVICE VIOLATED NFMA

### A. Logging in the White River LSR Violates the Northwest Forest Plan

Intervenor incorrectly asserts that Plaintiffs' comments did not raise the issue of

commercial logging in the LSR, and that this claim should be waived.  Int. Br. at 28.  Plaintiff

Bark commented extensively on LSR logging.  *See, e.g.*, AR 117536-7 ("Because so much

canopy within these [LSR] units is composed of by larger trees, thinning these stands to a lower

canopy cover would necessitate removing mature trees, which is inconsistent with promoting late

successional structure and habitat in general. . . In order to be in compliance with the NWFP's

Standards and Guidelines, the USFS must remove LSR Units 3, 5, 7, 8L, 9L, and 458 . . .").

Clearly, this issue was raised with adequate specificity at the appropriate time.

All thinning or silvicultural treatments inside reserves are subject to review by the

Regional Ecosystem Office (REO) to ensure treatments are beneficial to the creation of late-

successional forest conditions.  AR04305. The MHNF did not consult with the REO about the

CCR Project.  Intervenor suggests that the CCR Project falls under the blanket approval the REO

provided in 1996 for projects in the White River LSR: "[f]uture silvicultural activities described

in the LSR [Assessment] that meet both the criteria and objectives of the LSRA and the

Standards and Guidelines (S&Gs) in the [NWFP] are exempted from project-level REO review."

---

[13] Defendants cite cases upholding EAs with only a no-action and action alternative, but there, unlike here, the plaintiffs either did not challenge the FONSIs or failed to demonstrate that a significant effect might occur. *Earth Island Inst. v. Forest Serv*., 697 F.3d 1010, 1019–23 (9th Cir. 2012); *N. Idaho Cmty. Action Network v. U.S. Dep't of Trans*., 545 F.3d 1147, 1153–54 (9th Cir. 2008); *Native Ecosystems Council*, 428 F.3d 1233, 1249 (9th Cir., 2005). In *Earth Island*, for example, the plaintiffs never asserted that an EIS should have been prepared and conceded that the project "will have no significant environmental effects anyway." 697 F.3d at 1023.

Int. Br. at 27. This document is not included in the record, so there is no evidence the USFS relied on it while planning the CCR Project. Either way, it does not provide support for exempting the CCR Project from REO review because, as reiterated below, the CCR Project neither meets the criteria and objectives of the LSRA nor the NWFP's Standards and Guidelines.

### 1. The Authorized Logging Does Not Follow the White River LSR Assessment

While the USFS purports to follow the guidelines of the White River LSRA, AR20831, its selected logging prescriptions plainly do not. Defendant suggests that the LSR units are designated "Mature Stem Exclusion" and "Fire Exclusion Multi–Story stands." USFS Br. at 33. While the cited map is nearly impossible to decipher (*see* AR04886), if these are correct designations, the Project <u>still</u> does not comply with LSRA guidelines for most units. Defendants direct the Court to AR04776, suggesting that because "Open Park-Like" has a Desired Future Condition (DFC) of 25-40% canopy cover, logging down to 35% canopy cover in **all** LSR units complies with LSRA guidelines. This ignores the fact that other LSR units are categorized as "Cathedral" stands, with a DFC of 60-90% canopy cover, and as "Open Intolerant Multi-story," with a DFC of 40-60% canopy. *See* AR04776, 20783. Intervenor, in contrast, argues that the White River LSRA's language is "advisory" and "aspirational", thus no violation of the NFMA. Int. Br. at 29. This misunderstands Plaintiffs' argument. Plaintiffs do not argue that LSR prescriptions are legally binding, but that following them is a necessary factor in exempting a project from REO review.

### 2. The Authorized Logging Does Not Follow NWFP Standards & Guidelines

LSRs are to be managed to protect and enhance conditions for late-successional and old-growth forest ecosystems which serve as habitat for species like the NSO. AR04303. To that end, active management in LSRs for risk-reduction "shall focus on younger stands." AR04305.

Logging activity in older stands is appropriate only under very strict parameters including activities that will not prevent the LSR from playing an effective role in the objectives for which LSRs were established.  *Id*.  Units 3, 7, 5, and 9L are in LSRs that currently provide suitable spotted owl habitat.  Of these, units 3, 7 and 9L have already been thinned.  AR17536.  NEPA comments highlighted Unit 7 as an example LSR that would not benefit from additional logging: "At 140 years old, unit 7 has been thinned in the past, yet still contains patches of openings, snags, and down logs. Many trees, both Douglas fir and Ponderosa pine, were measured at nearly 40-inches DBH. At 50% canopy cover, it is without question on a trajectory to progress naturally towards a more complex, late successional stand."  AR17536.  As many LSR units currently provide suitable owl habitat and were *already* thinned to produce an open understory, the USFS has not made a compelling case for additional logging that will bring the average post-treatment canopy closure in the LSR units to **35%,** well below the canopy cover necessary for NSOs. *Supra II.A.1*.  Such logging is in direct conflict with the management guidelines of the NWFP.

   3.  Consistency Review Does Not Correct Violations of the NWFP

   Defendants cite Appendix A in the "consistency review" to support their proposition that the CCR Project complies with the LSR Assessment and NWFP.  AR17676, 17683 (document included twice).  However, there is no indication that Appendix A has any direct relation to the CCR Project; its guidelines were not included in the Project Design Criteria, nor disclosed in NEPA analysis, despite numerous requests for diameter limits.  Appendix A does not include a project name or date and is called a "sample prescription" by Defendant.  USFS Br. at 32. Finally, this entire "consistency review" was prepared as a post hoc rationalization after public comments raised questions about the lack of REO consultation; it is little more than an inaccurate box-checking exercise.  *See* AR17535, AR17668.  In conclusion, the USFS violated

the NWFP by failing to consult with the REO and in approving a plan to log in LSRs that would degrade late-successional habitat, including existing suitable NSO habitat.

### B. The CCR Project is Inconsistent with Forest Plan Snag Retention Standards

The MHNF Forest Plan requires that wildlife trees be maintained to support 60% of maximum biological potential of cavity nesting species. AR01422. During the interdisciplinary planning analysis, the USFS concluded certain Forest Plan exceptions were necessary, including an exemption from the snag density standard, FW-215, which "cannot be met because of . . . on-the-ground conditions present within the stands." AR16180-81. Not only are the proposed treatment units currently far below Forest Plan standards for snags, the CCR Project will result in both a direct, immediate loss of existing snags because of safety requirements for logging operations and a continuing deficit in snag recruitment as compared to "no action." AR20833, AR16383-84, AR20906. These are not disputed facts.

Because of the importance of snags for wildlife habitat, and the known snag deficit in the CCR Project area, in comments, Plaintiffs requested "an explanation of why the USFS seeks to exempt itself from snag density standards and an answer to the question: In a landscape that is already denuded of snags, what would be the impact on snag dependent species during the time lag when there are even fewer snags in the forest than there are now?" AR17547. Instead of answering these questions in subsequent NEPA documents, the USFS neglected to follow the process to legally exempt the Project from a "should" standard (see AR16180) and simply omitted including the exception from FW-215 in the Final EA and DN.

Defendant asserts that the "USFS concluded that an exception to FW-215 was unnecessary" citing a fragment of AR17384 (Wildlife Specialist's report). This cite does not support Defendant's assertion as it does not make an affirmative statement that conditions have

changed such that the Project now complies with FW-215.  To the contrary, the full section

acknowledges that "[i]mplementation of this project could result in the loss of some snags cut for

safety concerns," and "[s]nags that are left standing after thinning would be more prone to wind

damage and snow breakage than they would have been without thinning."  AR17384.

Without citing the record, Intervenor also argues the USFS changed course and decided

the project complies with FW-215.  Int. Br. at 29-30.  Intervenor introduces a novel argument

about FW-215, claiming the USFS's prediction that there will be more snags in the CCR Project

area at some point in the future meets the snag retention standard.  *Id.*  This interpretation of FW-

215 is scientifically illogical because dependent species need snag habitat both now *and* later.

Regardless, it makes its first appearance in Intervenor's briefs and is not entitled to deference.

*Public Citizen v. Nuclear Regulatory Comm'n*, 573 F.3d 916, 923 (9th Cir. 2009) ("court is

limited to a review of the reasoning the agency relied upon in making its decision."), *see also Or.*

*Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1141 (9th Cir. 2008) (rejecting counsel's

rationalizations that were not advanced by the agency when making its decision).  Intervenor

also argues that underburning some of the Project units after thinning will create additional snags

to ensure future compliance with FW-215.  Int. Br. at 30.  Again, the EA does not support this

contention, merely stating "[s]ome snags may be created during underburning activities" without

quantification, site-level analysis, or any mention of FW-215.  AR17623.

The record is clear that the existing, pre-project conditions make it impossible for the

CCR Project to comply with the snag retention standard.  The USFS never determined otherwise.

In similar situations, exempting a project from a Forest Plan standard through NEPA documents

disclosing the impacts to the public is a standard procedure.  The USFS began the process but

abandoned it midway through planning.  It matters not whether because of negligence, or

because revealing these impacts undermined the restoration narrative: this procedural failure

results in a Project that violates NFMA's consistency requirement. *See Native Ecosystems

Council v. Tidwell,* 599 F.3d 926, 932 (9th Cir. 2010), 16 U.S.C. § 1604(i), 36 C.F.R. §

219.15(d) (current planning rule); 36 C.F.R. § 219.10(e) (1982) (planning rule in place when

1990 MHNF Forest Plan was developed). Such a violation may seem minor, but it is a tangible

example of how circumventing regulatory constraints allows the agency to avoid legal and

scientific integrity, thereby compromising public scrutiny, on issues both small and large.

**IV**. **THE FOREST SERVICE FAILED TO COMPLY WITH THE TMR**

In developing the CCR Project, the USFS delineated a 24,000-acre planning area,

encompassing four subwatersheds, in which it would make numerous road related decisions as

part of a so-called "restoration project." AR16156-69, 20799-813, 21071, 21074. This is exactly

the type and scale of project of which the agency's own national and regional guidance expects

each National Forest unit to make significant progress toward implementing an environmentally

sustainable minimum road system (MRS). AR17029-30; 17055-57. Accordingly, Plaintiffs

urged the USFS to take a hard look at identifying the MRS for the CCR Project area, including

roads that should be fully decommissioned. *See e.g.* AR16886-98, 19176-90.

As a "restoration" project in an area with high road density, the CCR Project should have

included right-sizing the road network as a primary project objective because, if not now, when?

The USFS's failure to do so is another example of how this Project is "restoration" in name only,

and how the planning process cut corners instead of giving full attention to legal, and ecological,

necessities. Throughout the record, the USFS failed to engage its TMR obligations with any

sense of clarity; the draft and final EAs both state the agency was looking to its 2015 TAR

recommendations and analyzing *all* system roads within the planning area to determine which

were appropriate for closures, decommissioning or upgrading, "[i]n order to bring the Forest's transportation system into line with current policy, rectify inconsistencies, reduce impacts to natural resources, or reduce maintenance liabilities[.]" AR16156-57, 20799.  While this sounds as though the USFS sought to identify a minimum road network, it did not link this alleged effort to the regulatory criteria under 36 C.F.R. § 212.5(b).  Plaintiffs' comments explicitly requested that the agency explain how the resulting road network would meet the requirements of Subpart A.  AR16892-95.  Instead of providing this clarity, the DN suggests the USFS only considered the TAR's recommendations for those roads that would be used to carry out the Project (to haul timber).  AR21074.  Confusingly, the next sentence states "[t]he roads that are retained on the system were found to be needed for managing the Forest, which also follows the recommendations in the [TAR]….and that the resulting network of both open and closed system roads within the project area is the minimum necessary to manage the land." *Id*.

The issue did not get cleared up as the decision-making process progressed.  In response to Plaintiffs' objection, the USFS stated: "the Responsible Official properly used the [TAR] recommendations to identify the [MRS] within the draft decision's project area." AR20539. Now, Defendant attempts to duck the issue by claiming it did **not** identify the MRS as part of its CCR Project decision, without acknowledging the legal requirement to do so.  USFS Br. at 35. This type of unclear process in decision-making does not lead to a sense of confidence in Defendant's litigation position.  Indeed, it appears Federal-Defendant is conceding that the CCR Project did not identify the MRS, and thus failed to comply with the TMR.

In contrast to Federal-Defendant, Intervenor claims that USFS **did** comply with 36 C.F.R. § 212.5(b).  Intervenor argues the agency need only say the CCR Project was "designed and analyzed pursuant to the objectives of the [MHNF Forest Plan]" to demonstrate that the resulting

road network is the minimum needed to meet the Forest Plan's objectives, as required by the TMR. 36 C.F.R. § 212.5(b)(1); Int. Br. at 31-35. Merely referencing the Project's alleged consistency with the entire Forest Plan is no indication that its directives were considered in the context of identifying the MRS or unneeded roads for decommissioning. *See e.g. Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("[m]erely referencing a requirement is not the same as complying with that requirement. And stating that a factor was considered—or found—is not a substitute for considering or finding it.") Regardless of general statements of Forest Plan consistency, the record shows combined open road/motorized route densities in all four Project area subwatersheds greatly exceed Forest Plan open road density standards. Pl. Br. at 32 (citing AR20873-74). The CCR Project does nothing to reduce these excessively high road/route densities within the planning area; instead, density levels will increase during the life of the Project. AR20873-74; *see also* AR20875 (Table 39, showing the CCR Project would increase overall watershed impacts by 10%, 26%, 16%, and 19/23% for the Clear Creek, Middle Beaver Creek, Middle White River, and Wapanitia Creek subwatersheds).

Intervenor also misconstrues the intent of Subpart A to have the MRS "reflect long-term funding expectations." Int. Br. at 33; *see* 36 C.F.R. § 212.5(b)(1). This criterion relates to whether the resulting road system is economically sustainable. *See* Pl. Br. at 32-34. As the agency admits, the costs associated with reconstructing temporary roads alone "are substantially higher than that which could be supported by traditional levels of appropriated road maintenance funding at the District level, and continue to require additional funding sources to complete." AR20861. Thus, the agency is already adding road-related costs beyond what is currently available. Simply stating in the DN that the Project will implement prior NEPA decisions to close certain roads *if* more funding becomes available, AR21093-96, fails to reflect any actual

analysis as to the financial sustainability of maintaining roughly 135 miles of open roads, 30

miles of closed (ML1) roads, and over 44 miles of motorized routes while adding majors costs

for re-constructing and building 35.8 miles of temporary roads.  AR20855-56, 21070 (adjusting

numbers from EA to reflect decision to close approximately 5.6 miles of road).  Similarly

claiming the agency's decision to locate most temporary roads to be used for this Project on

"existing road alignments" (i.e. from illegally created OHV routes or previously

decommissioned roads) does little "to ensure that the [overall] identified system minimizes

adverse environmental impacts…" 36 C.F.R. § 212.5(b)(1), Int. Br. at 33-34.

        If the court finds that the USFS was not responsible for identifying the MRS as part of

the CCR Project, Defendant should nevertheless be held accountable for failing to take a hard

look at complying with Subpart A through this Project's NEPA process—especially in light of

the agency's 17+ year delay and calls from both the public and its own officers to do so.  66 Fed.

Reg. 3206 (Jan. 12, 2001) (Final Rule adopting Subpart A); AR17029 (2016 regional guidance

"strongly encourage[ing]" responsible officials to use large-scale projects like this one to address

the MRS "since it may be many years before an opportunity arises again in a given watershed").

The USFS failed to (1) clearly disclose to the public that it was choosing *not* to comply with 36

C.F.R. § 212.5(b) in planning the CCR Project, and (2) provide a rational explanation for its

inability or unwillingness to do so.[14]  Consequently, the USFS acted arbitrarily and capriciously

in violation of NEPA's 'hard look' requirement.  *Motor Vehicle Mfrs.*, 463 U.S. 29, 43 (1983);

40 C.F.R. §§ 1500.1(b), 1502.16, 1503.4(a)(5), 1508.8.  The CCR Project decision record clearly

---

[14] In fact, the Forest Service also initially claimed in response to Plaintiffs' comments that the 2015 TAR already identified the MRS for MHNF.  AR21022.  Following Plaintiffs' objection, *see* AR19182, the Forest Service acknowledged that this statement was in err as the TAR only provides *recommendations*.  The USFS must identify the MRS through subsequent NEPA project-level analysis.  AR21074, fn. 1; 17054-57.

demonstrates that the CCR Project does not comply with Subpart A of the TMR, and that USFS bypassed this important opportunity to right-size the road system.

## CONCLUSION

For the reasons stated above and in Plaintiffs' opening brief, Plaintiffs respectfully request that this Court grant their motion for summary judgment and deny the Federal-Defendant's and Defendant-Intervenor's motions for summary judgment.

Respectfully submitted this 1st day of March, 2019.


*/s/ Brenna Bell*                              */s/ Jennifer Schwartz*

Brenna Bell                                    Jennifer R. Schwartz
(503) 331-0374                                 (503) 780-8281
brenna@bark-out.org                            jenniferroseschwartz@gmail.com


*Counsel for Plaintiffs*

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT          39

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7-2(b)(2), the undersigned hereby certifies that the preceding memorandum contains 38.25 pages and 12,564 words including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and certificates of counsel.  On February 28, 2019, the Plaintiffs filed an unopposed motion (Dkt. # 31) seeking leave to file an over-length combined response/reply brief of not more than 40 pages.  On March 1, 2029 the Court granted Plaintiffs' motion for excess pages (Dkt. # 32).

DATED this 1st day of March, 2019.

*/s/ Jennifer Schwartz*

Jennifer R. Schwartz
(503) 780-8281
jenniferroseschwartz@gmail.com