IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**BARK**, **CASCADIA WILDLANDS**,
**OREGON WILD**, and **WILDEARTH**
**GUARDIANS**,

             Plaintiffs,

    v.

**UNITED STATES FOREST SERVICE**,

          Defendant,

   and

**HIGH CASCADE INC.**,

          Intervenor-Defendant.

No. 3:18-cv-01645-MO

OPINION AND ORDER

**MOSMAN, J.**,

    Plaintiffs Bark, Cascadia Wildlands, Oregon Wild, and WildEarth Guardians

(collectively "Bark") oppose the United States Forest Service's (USFS) authorization of forest

thinning on the southeastern slope of the Mount Hood National Forest (MHNF). Bark claims

that the USFS violated the National Environmental Policy Act (NEPA), the National Forest

Management Act (NFMA), and the Travel Management Rule (TMR) in authorizing the Crystal

Clear Restoration (CCR) Project. High Cascade Inc. was awarded the Ahoy Stewardship

Contract to implement a portion of the CCR Project and has intervened as a defendant.

Bark challenges the CCR Project under three main theories. First, that the USFS's Environmental Assessment (EA) for the CCR Project was arbitrary and capricious because it violated the procedural requirements of NEPA. Second, Bark claims that the CCR Project violates the NFMA because it is not consistent with the MHNF Plan or the Northwest Forest Plan (NWFP). Third, Bark challenges the CCR Project on the theory that the USFS failed to comply with the Travel Management Rule (TMR) by electing not to develop a "minimum road system" as part of the Project.

All parties moved for summary judgment on Bark's claims. Oral argument was held on April 19, 2019, and the parties' motions were taken under advisement. After supplemental briefing, I granted the USFS's and High Cascade's motions for summary judgment [29, 30] and denied Bark's Motion for Summary Judgment [18]. Order [44]. Bark then appealed and filed a Motion for an Injunction Pending Appeal [46]. After oral argument, I denied Bark's motion for an injunction in a written opinion and order on June 3, 2019. Order [63]. This opinion establishes the basis for my Order [44] on the parties' motions for summary judgment.

## BACKGROUND

The USFS undertook the CCR Project in order to "provide forest products from specific locations . . . where there is a need to improve stand conditions, reduce the risk of high-intensity wildfires, and promote safe fire suppression activities." AR 20779. The USFS also stated that thinning would help the remaining trees resist "stand-replacing events" such as disease and insect infestation. AR 21768. The Ahoy Stewardship Contract was awarded to High Cascade to implement a portion of the CCR Project—it will receive timber in exchange for executing the Project's "prescriptions," which include clearing brush and ladder fuels in addition to thinning.

Bark opposes the CCR Project because it believes that the USFS's objective is to produce timber rather than to address the risk of wildfire. Pls.' Br. [18] at 1. The Project is expected to yield double the normal annual timber volume produced by the MHNF. *Id.* at 2. The CCR Project will affect 11,742 acres and Bark alleges that 2,970 acres are in "mature, old-growth forests." *Id.* at 16. The Project includes 358 acres in the White River Late Successional Reserve (LSR), which is 34,500 acres large. Def.'s Br. [29] at 32. The remaining 11,384 acres of the Project are on land designated for timber harvest ("Matrix" land). Def.'s Reply. [35] at 5. The CCR Project will also impact areas that can be used by the Northern Spotted Owl (NSO), a threatened species. One thousand fifty-nine acres of NSO "suitable nesting, roosting, and foraging habitat" will be downgraded to dispersal habitat. Def.'s Br. [29] at 19. Another 859 acres of NSO dispersal habitat will be removed. *Id.*

The USFS approved the CCR Project after issuing an EA in which the proposed action and a "no action" alternative were considered. The USFS approved the CCR Project with a Finding of No Significant Impact (FONSI) and a Decision Notice, both issued on June 27, 2018. AR 21071–82.

## STANDARD OF REVIEW

This court's authority to review the actions of the Forest Service concerning the CCR Project derives from the Administrative Procedures Act, 5 U.S.C. § 706. The scope of judicial review under § 706 is narrow: a court must uphold an agency's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A).

An agency's decision is arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006)), *overruled on other grounds by Am. Trucking Ass'ns Inc. v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir. 2009). If the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made," a court must uphold the agency's action. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004).

Moreover, a court must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise. *Balt. Gas & Elec. Co.*, 462 U.S. at 103. It should not "act as a panel of scientists that instructs the Forest Service . . . , chooses among scientific studies . . . , and orders the agency to explain every possible scientific uncertainty." *Lands Council*, 537 F.3d at 988. A court should also "conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.'" *Id.* at 993 (quoting *Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006)). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 1000 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

## DISCUSSION

I.     National Environmental Policy Act

NEPA has two principal aims. First, NEPA requires government agencies to "consider every significant aspect of the environmental impact of a proposed action." *Balt. Gas & Elec.*

*Co.*, 462 U.S. at 97 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). Second, NEPA guarantees that relevant information about a proposed action is available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "NEPA is a procedural statute that does not 'mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.' " *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (quoting *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002)). To comply with NEPA, federal agencies must prepare an Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

A federal agency initially "may prepare an Environmental Assessment (EA) to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS." *High Sierra Hikers Ass'n*, 390 F.3d at 639–40 (citing *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001)). "Even though an EA need not 'conform to all the requirements of an EIS,' it must be 'sufficient to establish the reasonableness of th[e] decision' not to prepare an EIS." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1215 (9th Cir. 2008) (quoting *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agr.*, 681 F.2d 1172, 1178 (9th Cir. 1982)). An EA is "a concise public document" that serves to:

> (1)   Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact;
> (2)    Aid an agency's compliance with [NEPA] when no environmental impact statement is necessary;
> (3)   Facilitate preparation of a statement when one is necessary.

40 C.F.R. § 1508.9(a)(1)–(3).

"An EA must include 'brief discussions' of the need for the proposal, of reasonable

alternatives, and of the anticipated environmental impacts." *Hapner v. Tidwell*, 621 F.3d 1239, 1244 (9th Cir. 2010) (citing 40 C.F.R. § 1508.9(b)). An agency must then prepare an EIS "if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *Cal. Trout v. FERC*, 572 F.3d 1003, 1016 (9th Cir. 2009) (quoting *LaFlamme v. FERC*, 852 F.2d 389, 397 (9th Cir. 1988)). Whether or not a project's effect will be "significant" requires consideration of "context" and "intensity." 40 C.F.R. § 1508.27. Context refers to the setting in which intensity is analyzed and intensity is defined as the severity of the proposed action's impact, as measured by ten nonexclusive factors. § 1508.27(a), (b)(1)–(10). A court may find a substantial risk of a significant effect based on just one of these factors. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2004).

A. <u>Significant Effects</u>

1. <u>Context</u>

Bark spends little time discussing the context of the CCR Project. This is unsurprising, as few courts addressing context go beyond a recitation of the regulatory definition. *But see Anderson v. Evans*, 371 F.3d 475, 490 (9th Cir. 2004). The regulatory definition states that the context of an action can be "society as a whole (human, national), the affected region, the affected interests, and the locality. . . . [I]n the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole." 40 C.F.R. § 1508.27(a). Neither this regulation nor subsequent caselaw provides much further illumination.

Bark states that the significance of site-specific projects depends on "effects in the locale," but it does not articulate the boundaries of the relevant locale for several of the intensity

factors, leaving me to determine whether the locale is the entire MHNF, the Project area, or particular stands of trees. Pls.' Br. [18] at 9. The USFS provides some useful information about the Project area that suggests the relevant context in this case is the MHNF. The USFS highlights the fact that thinning will take place on only one percent of the MHNF. Def's Br. [29] at 13. The USFS also states that ninety-seven percent of the CCR Project will take place on Matrix lands, which are designated for timber production under the NWFP. Finally, the USFS argues that I must consider the effects of the CCR Project in the context of a forest that has departed from its natural conditions due to human intervention. Def.'s Reply [35] at 7.

The context for evaluating the intensity factors to determine whether the CCR Project may have a significant effect is the "the locale," which I understand to extend at least as far as the boundaries of the MHNF for some of the intensity factors. The USFS's characterization of the Project area is a useful baseline for measuring the effects of the Project when evaluating the intensity factors.

2. Intensity

Bark argues that the CCR Project involves five intensity factors: (1) highly controversial and uncertain environmental effects, (2) an adverse effect on a threatened species and its critical habitat, (3) the potential for a cumulatively significant impact, (4) adverse effects on ecologically critical areas, and (5) the violation of other legal requirements. Pls.' Br. [18] at 10–20.

a. Highly Controversial and Uncertain Environmental Effects

An agency action is controversial if "'substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor,' or there is 'a substantial dispute [about] the size, nature, or effect of the major Federal action.'" *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736 (quoting *Nw. Envtl. Def. Ctr. v. Bonneville Power*

*Admin.*, 117 F.3d 1520, 1539 (9th Cir. 1997); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)). There is substantial dispute if evidence "casts serious doubt upon the reasonableness of an agency's conclusions." *Id.*

Bark argues that two aspects of the CCR Plan are highly controversial and have uncertain environmental effects. The first is the USFS's decision to manage "mature forests that are not departed from their natural conditions" in order to reduce fire severity. Pls.' Br. [18] at 10–11. The second is the USFS's decision to manage old-growth forests in order to benefit the NSO.

i. <u>Treatment to Reduce Fire Severity</u>

Bark argues that thinning to reduce fire severity is highly controversial with respect to all "mature forests not departed from natural conditions." *Id.* at 10. The method that the USFS plans to use to perform thinning—a technique known as Variable Density Thinning (VDT)—has been used in dry plantation stands without the effects that Bark claims to cause controversy. But Bark argues that using VDT to prevent fires in in moist, old-growth stands is controversial. Pls.' Reply [33] at 2 ("While VDT has indeed been commonly used in dry, even-aged stands, applying it to a commercial sale in moist, older forests filled with larger trees up to 332 years of age, is unprecedented . . . .). Bark alleges that these stands are not susceptible to wildfire. The USFS's own reports show a small likelihood of an "active crown fire" under moderate- and low-moisture conditions. Pls.' Br. [18] at 13. Bark alleges that the proposed treatments may increase the risk of wildfire by, among other effects, drying out understory vegetation, allowing the growth of ladder fuels, and removing large trees that can withstand fire and retard a fire's spread. *Id.* at 12. This argument is supported by scientific observations provided to the USFS as part of the notice and comment process. *See, e.g.*, AR 19283; AR 17443–52.

The USFS first responds by stating that VDT allows for flexibility in determining which trees will be cut in any given stand. The treatment for a moist nonplantation stand may call for no trees to be thinned. Def.'s Reply [35] at 24. The USFS also notes that Bark failed to define "old growth," and that the USFS's surveys demonstrate that a small portion of the Project area includes stands that can be characterized as "older, larger trees." *Id.* at 2 (noting that less than one percent of moist mixed conifer stands in the Project area are classified as "late seral multistory" and no dry mixed conifer stands are "late seral multistory"). Even within this small area, the USFS argues the stands "would remain very similar after treatment" because VDT will "retain the majority of the large overstory trees." *Id.* at 8 (quoting AR 20835). Second, the USFS argues that where moist mixed conifer stands are treated, it will be to create a "defensible space for fire fighters" and to reduce the chance of widespread mortality from insects and disease, not to reduce the risk of fire. *Id.* at 5. Finally, the USFS states that thinning will move stands towards the "desired stand structure" by reducing stand density and increasing heterogeneity. *Id.* at 2.

Bark has produced evidence that casts some doubt on the USFS's conclusion that VDT in nonplantation stands will prevent fires. But that alone is not enough to satisfy the test for significance; I must also consider the context within which this intensity factor is evaluated. Nonplantation stands—meaning, stands that are not sapling areas or areas that have been previously "cleared of competing existing vegetation" and have had "new trees established by hand- or machine-planting—represent thirty percent of the Project area. *Id.* at 4; AR 16151. Nine percent of the Project area is nonplantation moist mixed conifer stands and twenty-one percent is nonplantation dry mixed conifer stands. *Id.* But less than one percent of the moist mixed conifer stands are classified as the type of old growth that Bark claims to cause

controversy when thinned to reduce the risk of fire. AR 20834. Even considering the locale to be the area that will be thinned, which is itself only one percent of the MHNF, any controversy regarding thinning to reduce the risk of fire is limited to a small portion of the locale.[1] While the CCR Project encompasses a large area, nonplantation thinning is concentrated only in the far eastern portion of the Project area, in dry conifer stands that are within the Juniper Flats Wildland-Urban Interface. *See* AR 21124. Bark did not propose that I consider this area to be the locale, instead focusing its argument on the controversial nature of thinning in "moist, mature and old-growth forests." Pls.' Reply [33] at 6. Given this context, I find that any controversy regarding the use of VDT to reduce the risk of fire does not raise a substantial question as to whether the CCR Project may cause significant degradation of a human environmental factor.

## ii. Management for the Benefit of the NSO

Bark argues that "logging previously unmanaged older forests for the alleged benefit of the [NSO] is highly controversial and involves a substantial degree of scientific uncertainty." Pls.' Br. [18] at 14 (citing *Or. Wild v. BLM*, 2015 WL 1190131, *7–9 (D. Or. March 14, 2015)). While the USFS noted that "there are still many unknowns regarding how much fire benefits or adversely affects northern spotted owl habitat," it ultimately found that the Project did not have any highly controversial or uncertain effects. AR 18291, 21078. While this differs from Bark's claim that the USFS has proposed logging for the benefit of the NSO, the CCR Project may still be highly controversial if there are "substantial questions" raised about whether it may cause significant degradation of the NSO and its habitat or if there is "substantial dispute" about the

---

[1] The MHNF "exceed[s] one million acres." AR 95. The CCR Project area is "roughly" 24,000 acres, of which 11,742 acres will be thinned. AR 16127, 21070. Nonplantation, moist mixed conifer stands make up 1,062 acres of the area to be thinned. Def.'s Reply [35] at 4. Less than 1% of the moist mixed conifer stands in the Project area are classified as "late-seral multistory." AR 20834.

size, nature, or effect of the Project on the NSO and its habitat. *See Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736.

The U.S. Fish and Wildlife Service (FWS) developed a "Recovery Plan" for the NSO, which states that "silvicultural treatments are not needed to maintain existing old-growth forests on moist sites. Efforts to alter either fuel loading or potential fire behavior in these sites could have undesirable ecological consequences." Pls.' Br. [18] Ex. A at 56–57. Bark argues that this guidance makes thinning in NSO habitat highly controversial. In addition, Bark cites scientific evidence that the NSO can survive in a stand where there has been a wildfire but not necessarily one in which the canopy closure has been reduced beyond a certain threshold. *See, e.g.*, *id.* at 15 ("[S]potted owls respond *better* to natural disturbances than to logging.").

Bark cites several cases in which an EIS was required for projects that affected fewer acres of NSO habitat than the CCR Project. *See id.* at 18. These cases are distinguishable. In *Klamath-Siskiyou Wildlands Center. v. U.S. Forest Service*, the USFS found that the NSO was likely to be adversely affected "due to direct owl disturbance and disruption of breeding." 373 F. Supp. 2d 1069, 1081 (E.D. Cal. 2004). That is not the case for the CCR Project, which does not contain any known NSOs. AR 18174. Bark also cited *Cascadia Wildlands v. U.S. Forest Service*, 937 F. Supp. 2d 1271 (D. Or. 2013), for the proposition that an EIS is required if NSO habitat will be affected. But in that case an EIS was required due to several intensity factors, not simply because of the project's effect on the NSO. *Id.* at 1283 ("[W]hen considered individually, none of these significance factors might require an EIS. However, when considered collectively, they do.").

The USFS response to Bark's argument about the effect on the NSO relies on evaluating effects at a large-enough scale. The NSO's range is described by reference to "recovery units,"

which are further divided into subunits and stands.  *See* Def.'s Br. [29] at 19.  The unit and

subunit involved in this case are 1.3 million acres and 140,000 acres, respectively.  AR 18182–

83.  At the subunit scale, the adverse effects are "very minimal."  AR 18205.  And at the unit

scale, no adverse effects are expected.  *Id.*  The USFS acknowledges that the NSO will be

adversely affected "at the stand scale" due to the removal of potential habitat but argues that the

effect is not significant on the "unit scale."  *Id.*  Although 2.4% of suitable NSO habitat at the

stand scale will be affected by the CCR Project, the USFS argues that an EIS is required only

where there will be a significant effect on the species or habitat "as a whole."  Def.'s Br. [29] at

18.  The USFS also highlights FWS's determination that there would be no "taking" or

modification of critical NSO habitat under the Endangered Species Act.  Def.'s Reply [35] at 14.

Although Bark rightly points out that these standards are much higher than the "significant

effect" that would trigger an EIS, the USFS argues that the FWS's finding lends support to its

determination that there will be no significant impact on the NSO.  *Id.*

The USFS's argument on this issue brings the importance of context into high relief.  As

an initial matter, no habitat currently occupied by territorial NSOs will be affected by the CCR

Project.  Def.'s Br. [29] at 20.  This is significant because the Ninth Circuit has previously found

that a project can be highly controversial based on its effect on the resident population of a

species.  *Anderson*, 371 F.3d at 490.  Contrary to the USFS's position, it is not necessary that a

project have a significant effect on the species as a whole.  *Id.*  Although Bark has produced

evidence that thinning may be more harmful to the NSO than fires, considering the context of the

CCR Project, it has not shown that "substantial questions" exist about whether the Project may

cause significant degradation of the NSO or that there is "substantial dispute" about size, nature,

or effect of the Project on the NSO.  I find it inappropriate to use the stand scale as the relevant

context in this case—every project in NSO habitat has a significant effect when viewed at a small scale. The NSO Recovery Plan analyzes effects at the subunit and unit scales, which I find to be appropriate contexts in which to evaluate whether the CCR Project is highly controversial. On either scale, the effect is so small that there are no substantial questions as to whether the Project may cause significant degradation of the NSO or its habitat. *See Cal. Trout*, 572 F.3d at 1016. Therefore, I find that the USFS did not violate NEPA by failing to conduct an EIS due to controversy regarding the Project's effects on the NSO and its habitat.

Bark also argues that thinning to benefit the NSO is controversial because the USFS did not evaluate the effect of the CCR Project on the NSO's competition with the barred owl. Pls.' Br. [18] at 17. Bark argues that reducing available habitat for the NSO will exacerbate interspecies competition and that the USFS failed to take a hard look at this significant effect. But the USFS noted the possible effect of logging on competition between the NSO and the barred owl. *See* AR 18165–69. While the CCR Project was not expected to favor the barred owl, the Biological Assessment stated that the loss of conifer forests more than 120 years old "is likely to increase the competition between the two owl species for territorial space with negative impacts to spotted owls." AR 18168. While Bark may object to the ultimate conclusion, it is not accurate to say that the USFS did not evaluate the issue.

b. Adverse Effect on a Threatened Species and its Critical Habitat

Bark argued that the CCR Project's effects on the NSO are significant as both "highly controversial" and as "affecting a threatened species and its critical habitat." I find little distinction between these formulations as Bark has presented them. Bark argued that thinning for the benefit of the NSO was highly controversial because there was "substantial dispute" regarding the effect of thinning on the NSO. But under the "adverse effect" analysis, I must

consider the more direct question of whether thinning will affect the NSO. Therefore, because I find that the CCR Project's management for the benefit of the NSO is not highly controversial, I also find that the Project will not have an adverse effect on the NSO and its habitat.

### c.   The Potential for a Cumulatively Significant Impact

Bark argues that the USFS failed to take a hard look at the cumulative impact of other projects in the MHNF and that "[s]ignificance exists if it is reasonable to anticipate a cumulatively significant impact on the environment" as a result of the CCR Project. 40 C.F.R. § 1508.27(b)(7). The USFS's analysis of cumulative impacts concluded that the Project would have "no significant cumulative effects." AR 21078. As discussed below, I do not find that the USFS failed to take a hard look at the CCR Project in light of the cumulative effect of past projects. Because Bark's argument on this intensity factor relies entirely on its contention that the USFS's assessment of cumulative impacts was flawed, I find that Bark has not shown that it is "reasonable to anticipate a cumulatively significant impact" resulting from the CCR Project. 40 C.F.R. § 1508.27(b)(7).

### d.   Adverse Effect on an Ecologically Critical Area

This intensity factor relates only to the effect of the CCR Project on the White River LSR. Pls.' Br. [18] at 19. The USFS is required to consider whether a project will have a significant effect due to any "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3).

The FONSI for the CCR Project stated that "[t]here will be no significant effects on unique characteristics of the area" because the Project is not in a designated wilderness area, wild and scenic river corridor, potential wilderness areas, or inventoried roadless areas. AR 21078.

Bark argues that the USFS was required to consider the White River LSR an "ecologically critical area" in deciding whether to complete an EIS. Pls.' Br. [18] at 33. Bark cites *Cascadia Wildlands v. U.S. Forest Service* for the proposition that an area set aside as a "protected land allocation," is an "ecologically critical area" for the purpose of requiring an EIS under NEPA. *Id.* at 19 (citing 937 F. Supp. 2d 1271, 1281–1284 (D. Or. 2013)). But *Cascadia Wildlands* evaluated the effects of a project on a "potential wilderness area," in which the USFS proposed to thin 1,249 out of 9,664 acres and build a permanent road in an otherwise roadless area. 937 F. Supp. 2d at 1281.

Rather than an adverse effect, the USFS argues that the CCR Project will have a long-term positive effect due to a decreased susceptibility to fire, insects, and disease. Def.'s Br. [29] at 23–24. The long-term benefit of the program does not, however, relieve the USFS of the requirement to prepare an EIS where a project will have significant environmental impact. *See Klamath-Siskiyou Wildlands Ctr.*, 373 F. Supp. 2d at 1086 (requiring an EIS where short term impacts "appear significant and highly uncertain" despite potential long-term reduction in wildfire risk). The USFS also argues that only a small percentage of the LSR would be affected by the Project: 358 acres out of the 34,500-acre LSR. Def.'s Br. [29] at 32.

Determining areas that are unique, in addition to those listed in the regulation, is an area that is within the USFS's discretion and should be upheld if it is reasonable. *Lands Council*, 537 F.3d at 987. Other than *Cascadia Wildlands*, which addressed a different type of land allocation, Bark did not provide any authority to support its proposition that the USFS was required to consider an LSR to be a unique characteristic of the Project area. Therefore, I find that the USFS did not fail to evaluate the Project area's unique characteristics when it did not include the impacts on the White River LSR in its analysis of this intensity factor. Even assuming that the

USFS was required to consider the LSR to be a unique characteristic of the Project area, Bark

has failed to show how the treatment of one percent of the LSR will have a significant effect on

the LSR.

      e.   Violation of Other Laws Imposed for the Protection of the Environment

Bark relies on its claims under the National Forest Management Act (NFMA) and the

Travel Management Rule (TMR) to establish this intensity factor.  As discussed below, I find

that the USFS did not violate the NFMA or the TMR in approving the CCR Project.  Therefore, I

also find no violation of NEPA based on a violation of the NFMA or the TMR.

      B.   Other Concerns Requiring a Hard Look Under NEPA

"Judicial review of agency decision-making under NEPA is limited to the question of

whether the agency took a 'hard look' at the proposed action as required by a strict reading of

NEPA's procedural requirements."  *Bering Strait Citizens for Responsible Dev. v. U.S. Army*

*Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008) (citing *Churchill County v. Norton*, 276 F.3d

1060, 1072 (9th Cir. 2001)).  Bark alleges that the USFS failed to take a hard look at three areas

of potential significant impact: (1) cumulative effects, (2) an accurate environmental baseline,

and (3) the effect of the CCR Project on climate change.

      1.   Cumulative Impact

When analyzing the cumulative impacts of an action, an agency is required to provide a

"useful analysis of the cumulative impacts of past, present, and future projects."  *Kern v. U.S.*

*Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002) (quoting *Muckleshoot Indian Tribe*

*v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999)).  A cumulative impact is defined as:

> the impact on the environment which results from the incremental impact of the
> action when added to other past, present, and reasonably foreseeable future
> actions regardless of what agency (Federal or non-Federal) or person undertakes

such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. The cumulative impact analysis must include "some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Ocean Advocates*, 402 F.3d at 868 (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379–80 (9th Cir. 1998)).

Bark argues that, although the EA listed other projects in the area, it did not give a "quantified assessment" of the other projects' environmental impacts. Pls.' Br. [18] at 21. In particular, there is no information on the other projects' date, size, road mileage, or either beneficial or adverse impact. *Id.* Bark admits that the USFS is permitted to aggregate cumulative impacts but claims that there is no evidence that it did so in a way that incorporated "relevant past timber sale inputs." Pls.' Reply [33] at 22. The USFS did, however, provide a baseline assessment of thirteen different forest resources and evaluated the Project's effect on each resource. AR 20829–30. The USFS argues that this is an acceptable method of measuring the cumulative effect of projects in this area. Def.'s Br. [29] at 26.

As I have held before, NEPA does not forbid an agency from aggregating its cumulative effects analysis. *See Bark v. Bureau of Land Mgmt.*, 643 F. Supp. 2d 1214, 1223 (D. Or. 2009) (citing *League of Wilderness Defenders–Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1217 (9th Cir. 2008)). So long as an agency "made no clear error of judgment that would render its action arbitrary and capricious," the agency is not required to analyze cumulative effects using any particular method. *Wilderness Defenders*, 549 F.3d at 1218 (quoting *Lands Council*, 537 F.3d at 993). "An agency may . . . characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected

an area." *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011)). Determining the area in which to assess cumulative impacts is "a task assigned to the special competency of the appropriate agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).

Bark also argues that the EA's analysis of the cumulative impact on the NSO is flawed because it focuses on too small an area. To account for the impact on the NSO, the USFS analyzed cumulative effects in the Project area and a 1.2 mile radius (the home range of a NSO) from eight potential nest sites that extend beyond the Project area. Def.'s Reply [35] at 20. In addition, the USFS analyzed cumulative effects on NSO habitat by looking at the Project area plus a 1.2 mile buffer around the entire Project area "to include any [NSO] territories that may overlap." *Id.* (citing AR 18551). Rather than the cumulative effects on the Project area and any overlapping known NSO home sites, Bark advocates for an analysis of the cumulative impact on the NSO at the subunit level. *See* Pls.' Br. [18] at 22. Because it is not irrational to evaluate the cumulative effects on the NSO by looking at the Project area and the home site radius beyond the boundary of the Project area, I find no violation of NEPA's cumulative impacts analysis with respect to the CCR Project's impact on the NSO.

## 2. Accurate Environmental Baseline

There is no independent legal requirement that the USFS use an accurate baseline to evaluate the impact of the Project. Bark argues that an accurate baseline falls under NEPA's requirement that an agency use "accurate scientific analysis" in determining whether an EIS is required. 40 C.F.R. § 1500.1(b). Bark claims that the USFS failed to provide an accurate baseline by characterizing the Project area as "dense, overstocked, and homogeneous." Pls.' Br. [18] at 23. This characterization is allegedly belied by surveys of the area by Bark volunteers

and by data in the EA showing between thirty and ninety percent canopy closure in the Project area. *Id.* Bark contends that this discrepancy makes it "impossible for the public to have a coherent, fact-based environmental baseline by which to evaluate the impacts of the Project." Pls.' Reply [33] at 25.

The EA is not as unequivocal as Bark contends. The EA states that there are "highly dense, homogenous stand conditions throughout *much* of the planning area." Pls.' Br. [18] at 23; AR 16127 (emphasis added). More important is the nature of the dispute on this issue: it is a conflict between the facts gathered by the USFS and those gathered by Bark. "Where the question presented for review is a factual dispute which implicates 'a high level of technical expertise' we defer to 'the informed discretion of the responsible federal agencies.'" *Bahr v. U.S. Envtl. Prot. Agency*, 836 F.3d 1218, 1229 (9th Cir. 2016) (quoting *Kleppe*, 427 U.S. at 412). Here, the USFS provided the results of its fieldwork in a detailed appendix to the EA. *See* AR 21097–21123 (describing the characteristics for each treatment unit). Although Bark disagrees with some of the USFS's data, assessing the condition of the Project area is an area within the USFS's expertise—a determination that is entitled to the highest level of deference. *See Balt. Gas & Elec. Co.*, 462 U.S. at 103. Bark's contention that it has found some areas that are not overstocked does not render the USFS's assessment "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council*, 537 F.3d at 987. Moreover, the USFS has explained that VDT will account for variations in stand density. Def.'s Reply [29] at 24 ("Where a stand is less overstocked, less thinning will be needed to meet the desired condition. And where a stand already meets the desired condition, no thinning will be needed."). This negates the contention that less densely stocked stands will be thinned inappropriately. Therefore, I find no violation of NEPA's hard look requirement on Bark's claim

that the USFS's EA failed to provide an accurate baseline with which to measure the effects of the CCR Project.

### 3. Climate Change

The Ninth Circuit has stated that the incremental effect of increased greenhouse gas emissions must be evaluated under a cumulative effects analysis; an agency cannot avoid that analysis by stating that a project's effect on climate change is too small to evaluate. *Ctr. for Biological Diversity*, 538 F.3d at 1217. Bark complains that the USFS did not adequately assess the CCR Project's effect on climate change in two ways. First, Bark alleges that the EA's climate change analysis was taken from an EA for a previous project, which was approximately one-fifth the size of the CCR Project. Pls.' Br. [18] at 24. Second, Bark argues that the USFS did not incorporate "the extensive information provided by public comments, including a formula for assessing the actual carbon impacts of individual timber sales." *Id.* Instead, the EA stated that the effect of the CCR Project on climate change was infinitesimally small because climate change is a global phenomenon. AR 16436.

The USFS argues that it accounted for the Project's effect on climate change by stating that thinning will promote the health of the forest, which will sequester carbon in the long run. AR 20938. The EA justified the release of carbon associated with the Project by stating that thinning will make the Project area more resistant to fire, and a stand-reducing fire would have a comparatively greater effect on climate change. AR 16436–37.

The parties' arguments on the USFS's assessment of the CCR Project's effect on climate change mirror those asserted elsewhere in the briefings. Whether the Project will have a net positive or negative contribution to carbon emissions depends on whether the USFS is correct in determining that thinning of overstocked stands will contribute to forest health and reduce the

risk of fire, insect infestation, and disease.  This debate is appropriately addressed in an analysis of whether the CCR Project will have highly controversial or uncertain effects.  To satisfy NEPA's hard look requirement, it is sufficient that the USFS undertook a thorough examination of the question.  Because it did so, I find that the USFS did not violate NEPA's hard look requirement with respect to its evaluation of the CCR Project's effect on climate change.

C.  Consideration of Alternatives

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(E).  "Although an agency must still give 'full and meaningful consideration to all reasonable alternatives' in an environmental assessment, the agency's obligation to discuss alternatives is less than in an EIS." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008)).  "The existence of a viable but unexamined alternative renders an [EA] inadequate."  *Id.* (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)).

The USFS explored only one alternative to the CCR Project, the "no action alternative."  As part of the administrative process, Bark requested that the USFS evaluate several other alternatives, including: (1) logging only in areas that have diverged from their natural fire regimes, (2) logging outside of high-quality owl habitat, (3) setting a diameter limit on trees logged, and (4) building fewer roads.  Pls.' Br. [18] at 25.  Bark argues that, aside from reduced timber yield, these alternatives would accomplish the USFS's stated purpose for the CCR Project while "enhancing environmental quality or avoiding adverse environmental effects."  *Id.*

There is no "numerical floor on alternatives to be considered," and it is usually sufficient to consider only the preferred and no action alternatives. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). The USFS argues that it was not required to consider Bark's alternatives in any depth because they "did not promote the project's stated goals." Def.'s Reply [35] at 27 (quoting *Bark v. Northrup*, 607 F. App'x 652, 654 (9th Cir. 2015)). The USFS explained that limiting the areas to be thinned would upset the Project's balancing of fire prevention, NSO habitat maintenance, and timber production. *Id.* at 27–28. Bark's recommendation to establish an upper limit on tree diameter was not considered because it would defeat the purpose of VDT, which allows for site-specific assessment of which trees should be thinned. *Id.* at 28. Finally, the recommendation to limit logging in NSO areas was not considered because (1) there was no assurance that this would benefit the NSO, and (2) the NSO Recovery Plan recommends that land managers "actively restore forest ecological structure and alter fire behavior and severity." Def.'s Br. [29] at 30.

Because the USFS articulated a rational connection between the purposes of the CCR Project and the reasons for rejecting Bark's proposed alternatives, I find that there were no reasonable alternatives that failed to receive full and meaningful consideration. *See Balt. Gas & Elec. Co.*, 462 U.S. at 105. Therefore, I find that the USFS's consideration of only the proposed action and the no-action alternative did not violate NEPA. *See Native Ecosystems*, 428 F.3d at 1246.

II.     National Forest Management Act

Unlike NEPA, which is purely procedural, the NFMA imposes substantive constraints on forest management. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 898 (9th Cir. 2002). The NFMA requires the USFS to create a comprehensive Land Resources Management Plan,

also known as a Forest Plan, for each national forest and prohibits any site-specific activities that are inconsistent with the Forest Plan. *Lands Council v. Powell*, 395 F.3d 1019, 1033 (9th Cir. 2005) (citing *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996)). In this case, the CCR Project must comply with the MHNF Forest Plan and the Northwest Forest Plan (NWFP). *See* 16 U.S.C. § 1604(i).

Bark claims that the CCR Project does not comply with the NWFP for two reasons. First, Bark argues that the Project does not comply with the NWFP's restriction on active management of LSRs and requirement that the Regional Ecosystem Office (REO) review thinning within LSRs to ensure that treatments are beneficial to the creation of late-successional forest conditions. AR 4305. The USFS did not seek REO review of the CCR Project's activities in the White River LSR. Second, Bark claims that the CCR Project violates the MHNF Forest Plan's requirement for the retention of of dead standing trees ("snags"). Pls.' Br. [18] at 30. The Project area is already below the required number of snags and some snags might be cut as part of the Project.

A. Logging in the White River LSR

The NWFP suggests that forest management in LSRs focus on young stands, but it permits management of older stands in LSRs if "(1) the proposed management activities will clearly result in greater assurance of long-term maintenance of habitat, (2) the activities are clearly needed to reduce risks, and (3) the activities will not prevent the [LSRs] from playing an effective role in the objectives for which they were established." AR 4305. One reason that the LSRs were established was to serve as habitat for the NSO. AR 4301. As described above, Bark contends that the CCR Project will not benefit the NSO, even if it does reduce the risk of fire, as the outright removal of NSO habitat might be more detrimental to the NSO than fire. In

response, the USFS repeats its claim that the Project will serve the objectives of the LSR by preventing major disturbances such as fire, disease, and insect infestation.

Here again the parties contest whether thinning is needed to prevent stand-replacing events. But, as opposed to the procedural requirements of NEPA, in an analysis under the NFMA I must consider only whether the USFS's decision was arbitrary and capricious. I find that it was not. Although Bark disagrees with the USFS's conclusion, the USFS "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co.*, 462 U.S. at 105. Therefore, I find no violation of the NFMA due to the CCR Project's thinning in the White River LSR.

Bark also argues that the CCR Project's activities in the White River LSR required approval by the REO "to ensure that the treatments are beneficial to the creation of late-successional forest conditions." AR 4304. Bark asserts that REO review is mandatory and that the CCR Project violates the NWFP because there was no REO review. The REO has, however, exempted review for projects that comply with the White River LSR Assessment. Def.'s Reply [35] at 29. The parties disagree about whether the CCR Project complies with the White River LSR Assessment and therefore, whether the Project is exempted from REO review. This disagreement centers on whether the Project's post-thinning canopy closure will comply with the Assessment's definitions.

The Assessment gives a target range of canopy closure for different types of stands (e.g., open park-like, open intolerant multistory, and cathedral). Open park-like stands should have canopy closure between twenty-five and forty-five percent. AR 4776. The CCR Project set a target canopy closure of thirty-five percent in the LSR after thinning. The USFS argues that nothing in the Assessment dictates the percentage of the LSR that must be managed to maintain

one type of stand structure rather than another. Def.'s Reply [35] at 30. Therefore, the USFS

can design a project—as it has here, at least for the eastern portion of the White River LSR—that

results entirely in open park-like stands. *See id.* at 29–30.

Bark has not shown that the CCR Project is inconsistent with the LSR Assessment.

Because one percent of the LSR will be affected by the Project, I am not convinced that the

USFS's plan to thin areas in the LSR to create open park-like stands is inconsistent with the

Assessment. Based on the record before me, I find no violation of the NFMA based on the

USFS's failure to obtain REO review of the CCR Project.

      B.  <u>Snag Retention Standards</u>

Both parties agree on the requirements of the MHNF Forest Plan's "Snag Retention

Standard," that the treatment area does not currently meet the Standard, and that the area will not

meet the Standard after thinning. At issue is whether the Project will violate the Snag Retention

Standard by removing snags or preventing the creation of snags. Bark argues that safety

regulations will require the removal of any snags that pose a danger to workers. Pls.' Br. [18] at

30. Thinning will also necessarily remove trees that would eventually become snags.

The USFS initially believed that the CCR Project would require an exception to the Snag

Retention Standard. Def.'s Br. [29] at 34–35. However, in the final EA it determined that no

exception was necessary because there is no plan to cut snags; the "insignificant" number of

snags that will be cut due to safety concerns will remain nearby. Def.'s Reply [35] at 32.

Addressing Bark's argument about snag development, the USFS takes a familiar position,

arguing that thinning will result in "a greater number of larger green retention trees for future

snag recruitment . . . moving the stands closer to the Forest Plan snag density standards." AR

20836.

Based on this argument, combined with the fact that there is no plan to cut snags, I find the USFS's interpretation of its compliance with the Snag Retention Standard to be rational. Premised on the well-supported belief that VDT will promote forest health, the USFS is entitled to deference in its determination that thinning will enable treated stands to achieve the desired level of snags. Therefore, I do not find that the USFS violated the NFMA in approving the CCR Project in areas that do not currently meet the MHNF Forest Plan's Snag Retention Standard.

III.    Travel Management Rule

The TMR requires the USFS to identify a "minimum road system" (MRS) that would allow unused or underused roads to be decommissioned. The identification of an MRS is governed by a regulation ("Subpart A") that is codified at 36 C.F.R. § 212.5(b)(1). Subpart A states that:

> [t]he minimum system is the road system determined to be needed to meet resource and other management objectives adopted in the relevant [forest plan], to meet applicable statutory and regulatory requirements, to reflect long-term funding expectations, to ensure that the identified system minimizes adverse environmental impacts associated with road construction, reconstruction, decommissioning, and maintenance.

*Id.* Subpart A also requires the USFS to identify roads "that are no longer needed to meet forest resource management objectives and that, therefore, should be decommissioned or considered for other uses, such as for trails." *Id.* § 212.5(b)(2). The USFS has devised a process for complying with Subpart A that is consistent with the regulation. First, it completed a travel analysis process, the results of which were documented in a travel analysis report (TAR). *See* AR 7321–7407. The USFS plans to use the TAR to identify the roads that can be decommissioned. AR 17054. That process can be accomplished as part of "landscape level restoration projects or stand alone as a single purpose proposal." AR 17029.

Bark claims that the CCR Project identified a minimum road system but did not comply with Subpart A. In the alternative, Bark claims that the USFS should be "held to account for failing to take a hard look at complying with Subpart A through this project's NEPA analysis." Pls.' Reply [33] at 38. Bark's arguments fail because the CCR Project did not identify an MRS, nor was the USFS required to do so. While the EA referenced the TAR, it did not make a final decision about an MRS. Although MRS proposals may be incorporated into landscape-level restoration projects such as this one, the USFS may also choose to identify a minimum road system as a stand-alone proposal. AR 17029. I find no statutory basis for requiring the USFS to identify a minimum road system as part of the CCR Project. Therefore, I find that the USFS did not violate the TMR in approving the CCR Project without identifying an MRS or complying with Subpart A.

## CONCLUSION

For the reasons set forth above, I find that the USFS did not violate NEPA, the NFMA, or the TMR in approving the CCR Project. Therefore, the USFS's Motion for Summary Judgment [29] and High Cascade's Motion for Summary Judgment [30] are GRANTED. Bark's Motion for Summary Judgment [18] is DENIED.

IT IS SO ORDERED.

DATED this __18__ day of June, 2019.

*Michael W. Mosman*
MICHAEL W. MOSMAN
Chief United States District Judge